ROLF ET AL. *v.* TRI STATE MOTOR TRANSIT COMPANY ET AL.

[Cite as *Rolf v. Tri State Motor Transit Co.* (2001), 91 Ohio St.3d 380.]

(No. 00–1329—Submitted January 31, 2001—Decided April 25, 2001.)

FRANCIS E. SWEENEY, SR., J. This matter is before us as a certified question of state law from the United States District Court, Northern District, Western Division. In its certification order the federal district court states:

"Kenneth Martin, father of plaintiffs Bonnie L. Rolf and David Martin (both emancipated adults living apart from their parents), was seriously and permanently injured on October 8, 1996, in Allen County, Ohio, when his vehicle was struck from behind by a semi-trailer truck being operated by Dallas K. Pelcher, in the course and scope of his employment for the defendant Tri State Motor Transit Company. As a result of the accident, Kenneth Martin's cognitive functions and ability to control basic bodily functions have been seriously impaired. For the rest of his life he will require convalescent care and continuing medical treatment.

"* * *

"Plaintiffs Bonnie L. Rolf and David Martin filed the instant proceeding in the certifying Court on November 8, 1999. Plaintiffs seek to recover damages for the loss of consortium that they have suffered as a result of the injuries to their father."

Pursuant to S.Ct.Prac.R. XVIII, the federal district court has certified the following question of law to this court for our determination:

"Can emancipated adult children maintain a claim under Ohio law for the loss of consortium caused by injuries to a parent?"

For the reasons that follow, we answer the certified question in the affirmative.

This court has previously recognized a minor child's cause of action for loss of parental consortium. *Gallimore v. Children's Hosp. Med. Ctr.* (1993), 67 Ohio St.3d 244, 617 N.E.2d 1052, paragraph two of the syllabus. We are now asked to extend the holding of *Gallimore* to allow adult children to pursue a similar cause of action for parental loss of consortium.

The rationale advanced in favor of recognizing a minor child's loss-of-parental-consortium claim in *Gallimore* was taken, in large part, from Justice Resnick's dissenting opinion in *High v. Howard* (1992), 64 Ohio St.3d 82, 86–96, 592 N.E.2d 818, 821–827, a decision that *Gallimore* overruled.[1] These policy arguments can be summarized as follows: (1) since a minor child can recover similar damages under the wrongful death statute, R.C. 2125.02, when a parent dies, he or she should also be allowed to recover for loss of parental consortium when a parent is injured but not killed; (2) since Ohio already recognizes spousal and filial consortium claims, it should likewise recognize a minor's loss-of-parental-consortium claim, since the claimant's loss consists of many of the same elements in each type of consortium claim, including the loss of love, affection, and companionship. Therefore, to deny a loss-of-parental-consortium claim would relegate the parent-child relationship to second-class status behind spousal consortium claims or filial consortium claims; and (3) a minor child should be ·allowed to recover for loss of parental consortium because the child suffers a very real and debilitating loss when a parent is injured and deserves to be compensated for that loss.

Petitioners argue that these policy reasons apply to adult children as well as minors. Consequently, they maintain that they should not be denied their right to recovery simply because they are adults. Respondent Tri State, however, rejects these arguments and instead contends that there are more persuasive reasons for refusing to extend loss-of-parental-consortium claims to adult, emancipated children.[2]

---

1. The primary issue in *Gallimore* was whether Ohio should recognize a cause of action for filial consortium, *i.e.*, an action brought by parents to recover damages arising out of their minor child's injuries. 67 Ohio St.3d 244, 246, 617 N.E.2d 1052, 1053–1054. In recognizing such an action, *id.* at paragraph one of the syllabus, we then addressed the corresponding cause of action for a minor child's claim of loss of parental consortium. Since the only issue before this court concerns loss of parental consortium, we are limiting our discussion to that issue.

2. Respondent contends that the fact that an adult child may recover damages under the wrongful death statute is irrelevant and does not create an anomaly. However, in *Gallimore,* we found this incongruity to be a relevant consideration in recognizing a parent's claim of loss of consortium of a

The primary reason why respondent urges us to limit the holding of *Gallimore* to minor children is its belief that while minors suffer a compensable loss when a parent is injured, this loss is compensable only because minors are dependent upon a parent for their care and emotional guidance. By contrast, respondent maintains that the loss is so much less severe with adult children because they are no longer reliant upon a parent for financial or emotional support. Based upon this inherent difference, respondent concludes that we should not extend loss-of-parental-consortium claims to adult children.

We reject the reasoning advanced by respondent. The fact that an adult child's relationship with a parent differs from that of a minor child does not provide us with justification for refusing to recognize an adult child's loss-of-parental-consortium claim. In *Gallimore*, we held that consortium may include services, society, companionship, comfort, love, guidance, and solace. *Id.*, 67 Ohio St.3d 244, 617 N.E.2d 1052. The essence of a parental-consortium claim is that a child is compensated for a harm done or for losses suffered as a result of injury to the parent and to the parent-child relationship. Mogill, And Justice For Some: Assessing the Need to Recognize the Child's Action for Loss of Parental Consortium (1992), 24 Ariz.St.L.J. 1321, 1324–1325. Certainly, both minor and adult children whose parent has been injured have suffered a loss that fits within this definition. In that regard, we agree with the sentiment expressed by the court in *Nelson v. Four Seasons Nursing Ctr.* (Okla.App.1996), 934 P.2d 1104, 1105, when it stated:

"There is simply no good reason to afford the personal right of companionship and the parent-child relationship less protection in cases involving adult children who seek to recover for injury to the parent-child relationship. In cases where the parent-child relationship is destroyed or nearly destroyed by the tort of the defendant, the affected children, both minors and adults alike, should be allowed to maintain a cause of action for loss of parental consortium."

Furthermore, while it is true that minor children are more dependent upon their parents to satisfy their basic needs, as noted by one law review article, many adults actually renew their reliance on their parents when they reach middle age. Hammar, Breaking the Age Barrier in Alaska: Including Adult Children in Loss of Filial Consortium Actions (1995), 12 Alaska L.Rev. 73, 85. Therefore, just as minor children look to their parents for emotional support, those adult children who continue to enjoy a close relationship with their parents still depend upon their parents for affection, advice, and guidance as they become older. Consequently, when a parent is seriously injured, the adult child suffers

---

minor child. *Gallimore v. Children's Hosp. Med. Ctr.* (1993), 67 Ohio St.3d 244, 249–250, 617 N.E.2d 1052, 1056. We adhere to that rationale in this case as well.

an injury in being deprived of that parent's love and guidance. Therefore, regardless of the age of the child, the loss to the parent-child relationship is real and should not be minimized.

Therefore, we find that it is irrational to deny recovery for loss of parental consortium simply because the child has reached the age of majority. The fact that a child turns eighteen does not erase the need for parental guidance. As one commentator so aptly notes: "The parent-child relationship does not end when the child becomes eighteen. It endures throughout life and can be characterized by love, care and affection for the duration." *Id.*, 12 Alaska L.Rev. at 83. In that regard, it is important to recognize that " '[e]ven adult and married children have the right to expect the benefit of good parental advice and guidance.' " *Audubon–Exira Ready Mix, Inc. v. Illinois Cent. Gulf RR. Co.* (Iowa 1983), 335 N.W.2d 148, 150, quoting *Schmitt v. Jenkins Truck Lines, Inc.* (Iowa 1969), 170 N.W.2d 632, 665.

The Arizona court in *Howard Frank, M.D., P.C. v. Maricopa Cty. Superior Court* (1986), 150 Ariz. 228, 232, 722 P.2d 955, 959, reiterated this rationale when recognizing a filial consortium claim (brought by parents to recover for injuries sustained by their adult child), when it stated:

"Surely nature recoils from the suggestion that the society, companionship and love which compose filial consortium automatically fade upon emancipation[,] while common sense and experience teach that the elements of consortium can never be commanded against a child's will at any age. The filial relationship, admittedly intangible, is ill-defined by reference to the ages of the parties and ill-served by arbitrary age distinctions. Some filial relationships will be blessed with mutual caring and love from infancy through death while others will always be bereft of those qualities. Therefore, to suggest as a matter of law that compensable consortium begins at birth and ends at age eighteen is illogical and inconsistent with common sense and experience."

This rationale applies with equal force in the context of an adult emancipated child's cause of action for loss of parental consortium. The facts of this case demonstrate how great this loss is and why adult children deserve to be compensated. Here, the petitioners' father suffered a traumatic brain injury, is physically and mentally impaired, and will require custodial care for the remainder of his life. Petitioners have, for all practical purposes, lost the essence of the relationship they once enjoyed with their father. Because of his debilitating injuries, they can no longer enjoy life experiences with their father nor can they turn to him for advice, guidance, or emotional support. Certainly, these adult children deserve to be compensated for the tragic losses sustained just as minor children do.

In conclusion, we find no legitimate reason to limit recovery for loss of parental consortium to minor children. Consequently, we hold that adult emancipated children may recover for loss of parental consortium. As we have now recognized an emancipated adult child's loss-of-consortium claim, these individuals, who were previously denied compensation due to an artificial age barrier, may now seek the legal redress they are entitled to for the losses they have suffered.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK, PFEIFER and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs in judgment.

---

*Bashein & Bashein Co., L.P.A.,* and *W. Craig Bashein; Paul W. Flowers Co., L.P.A.,* and *Paul W. Flowers,* for petitioners.

*Shumaker, Loop & Kendrick, LLP,* and *William H. Heywood III,* for respondent.

*Calhoun, Kademenos & Heichel Co., L.P.A.,* and *Janet L. Phillips,* in support of petitioners for *amicus curiae,* Ohio Academy of Trial Lawyers.

OFFICE OF DISCIPLINARY COUNSEL *v.* HARP.

[Cite as *Disciplinary Counsel v. Harp* (2001), 91 Ohio St.3d 385.]

(No. 00–1891—Submitted December 13, 2000—Decided April 18, 2001.)

---

*Per Curiam.* In 1994, Gary York hired respondent, Edward Harp of George-town, Ohio, Attorney Registration No. 0023236, to appeal a finding of the Industrial Commission disallowing his workers' compensation claim. Respondent filed York's appeal, but failed to file a response when the state moved to dismiss for lack of prosecution. As a result, York's appeal was dismissed and respondent, after learning of the dismissal, took no action to attempt to set it aside.

Earlier, in 1993, Mickel and Debbie Long engaged respondent and paid him $250 to collect a judgment in Tennessee. Respondent took no action in the matter until informed by the Longs in 1998 that the judgment debtor had moved to Virginia, when respondent engaged local counsel for assistance in that state. However, respondent not only failed to forward the necessary paperwork to local Virginia counsel, but he allowed the matter to languish for more than five years. During that time, the Longs became increasingly dissatisfied with respondent's failure to communicate with them. In January 1999, respondent terminated the services of local counsel, and in February 1999, respondent himself withdrew from representation, leaving the Longs without counsel in either state.

Still earlier, from 1987 through 1999, by meeting with Donald Crawford and preparing several complaints that were never filed, respondent led Crawford to believe that he would file a complaint in the Ohio Court of Claims for injuries that Crawford received while incarcerated in prison.

Based on grievances received from York, the Longs, and Crawford, relator, Office of Disciplinary Counsel, filed an amended complaint on February 28, 2000, charging respondent with violation of several Disciplinary Rules. Respondent answered, and the matter was heard by a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board").

After conducting a hearing and receiving stipulations of the parties, the panel found the facts as stated and concluded that in each matter respondent's conduct had violated DR 6–101(A)(3) (neglecting an entrusted legal matter), 7–101(A)(1) (intentionally failing to seek the legal objectives of the client), 7–101(A)(2) (failing to carry out a contract for professional services), and 7–101(A)(3) (prejudicing or damaging a client during the course of the professional relationship).

In mitigation, the panel found that respondent had demonstrated remorse. Respondent admitted that he had failed to properly calendar the York matter and had not followed through for the Longs, who had a malpractice action pending against him. In addition, Crawford had been a long-term client of respondent's and from 1987 through 1999, respondent had handled numerous matters for Crawford, including a potential divorce action, a charge of disorderly conduct, a bankruptcy for him and his wife, and a case involving Crawford's daughter. Respondent explained that his investigation of Crawford's prison stay revealed that Crawford was guilty not only of the crimes of which he was convicted, but also of other felonies. Moreover, respondent could develop no facts to support Crawford's alleged mistreatment in prison. In further mitigation, the panel found that as late as January 2000, Crawford continued to contact respondent for legal representation in other matters. Finally, the panel found that respondent presented evidence that he had taken steps to reduce his caseload, increase his staff, and adopt management practices to avoid these problems in the future.

The panel recommended that respondent be suspended from the practice of law for six months with the entire six months stayed and that for the next year respondent be placed on probation, with his law practice monitored by a local attorney selected by the mutual consent of the relator and the respondent. The board adopted the findings and conclusions of the panel, but modified the recommendation to reduce the probation period to six months.

After a review of the record, we adopt the findings, conclusions, and recommendation of the board. Respondent is hereby suspended from the practice of law for six months with the entire six months stayed. Effective immediately, respondent is placed on probation for six months, with his law practice to be monitored by a local attorney selected by relator and respondent. Failure to satisfy the conditions of his probation will result in reinstatement of respondent's stayed suspension. Costs are taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

*Jonathan E. Coughlan,* Disciplinary Counsel, and *Kenneth R. Donchatz,* Assistant Disciplinary Counsel, for relator.

*Peter Rosenwald,* for respondent.

OFFICE OF DISCIPLINARY COUNSEL *v.* BARNETT.

[Cite as *Disciplinary Counsel v. Barnett* (2001), 91 Ohio St.3d 387.]

(No. 00–1900—Submitted December 13, 2000—Decided April 18, 2001.)

*Per Curiam.* On August 29, 2000, relator, Office of Disciplinary Counsel, filed a second amended complaint charging respondent, David C. Barnett of Urbana, Ohio, Attorney Registration No. 0027871, in twelve counts with numerous violations of the Code of Professional Responsibility and the Rules for the Government of the Bar. Respondent failed to answer the complaint, waived a hearing, and agreed to stipulated facts, which were presented to a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board").

Accepting the stipulations of the parties, the panel concluded that respondent had violated DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(6) (a lawyer shall not engage in conduct adversely reflecting on fitness to practice law), 6–101(A)(3) (a lawyer shall not neglect an entrusted legal matter), 7–101(A)(1) (a lawyer shall not fail to seek the lawful objectives of a client), 7–101(A)(2) (a lawyer shall not

fail to carry out a contract of employment), and 7–101(A)(3) (a lawyer shall not prejudice or damage a client). These conclusions were based on its findings that in 1997, after having been appointed as appellate counsel for Charles Rutherford, who had been convicted of aggravated assault, respondent failed to file an appellate brief, with the result that the appeal was dismissed. When questioned by relator under oath, respondent falsely claimed that he had filed the brief.

The panel further concluded that respondent had violated DR 1–102(A)(4), 1–102(A)(6), and 9–102(A) (a lawyer shall deposit funds of a client in an account in which no funds of the lawyer are deposited). The panel found that respondent had settled a personal injury claim for James Muller but had failed to repay to the United States a portion of that recovery to which it was entitled. When respondent finally issued a check from his trust fund to the United States, it was returned for insufficient funds.

The panel also concluded that respondent violated DR 1–102(A)(4), 7–101(A)(1), and 9–102(B)(4) (a lawyer shall promptly deliver to a client the funds a client is entitled to receive). The panel found that in 1998, respondent received $550 from John Merey to open a savings account for him but failed to do so and also failed to return the money when requested by Merey.

The panel found that in 1999, respondent was engaged by Dawn Greene and paid $535 to initiate divorce proceedings for her. He was also engaged by Darci L. Neville and paid $500 for the same type of proceeding. Yet respondent failed in both cases to take action on behalf of his clients, and thereby violated DR 6–101(A)(1), 7–101(A)(1) and (2), and 9–102(B)(4).

Finally, respondent's client trust account was overdrawn on several occasions from 1997 through 1999 and during that period respondent paid numerous personal expenses from that account. The panel concluded that by that conduct that respondent had violated DR 9–102(A).

Respondent failed to respond to letters of inquiry from relator, to relator's telephone calls relating to the grievances filed against him, and to a subpoena *duces tecum* issued by the board. Hence, the panel concluded that he had violated Gov.Bar R. V(4)(G) (an attorney shall cooperate in a disciplinary investigation).

In the absence of any mitigating evidence, the panel recommended that respondent be indefinitely suspended from the practice of law in Ohio. The board adopted the findings, conclusions, and recommendation of the panel.

We adopt the findings and conclusions of the board with one exception. We do not conclude that in representing Greene and Neville that respondent violated DR 6–101(A)(1) (a lawyer shall not handle a legal matter which he knows he is not competent to handle). As we said in *Findlay/Hancock Cty. Bar Assn. v.*

*Filkins* (2000), 90 Ohio St.3d 1, 3, 734 N.E.2d 764, 766, the "relator must prove * * * misconduct by clear and convincing evidence." See Gov.Bar R. V(6)(J). Our review of the stipulations and deposition of respondent indicates that while respondent neglected the Greene and Neville matters, nothing in the record clearly and convincingly shows that respondent was attempting to handle legal matters that he was not competent to handle. To show a violation of DR 6–101(A)(1), relator should have introduced evidence to demonstrate that this solo practitioner with over fifteen years' experience as a lawyer was not competent to handle divorce matters.

Nevertheless, respondent's other actions and failures to act are so substantial that we adopt the recommendation of the board. Respondent is hereby indefinitely suspended from the practice of law in Ohio. Costs are taxed to respondent.

*Judgment accordingly.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

---

*Jonathan E. Coughlan*, Disciplinary Counsel, and *Stacy Solochek Beckman*, Assistant Disciplinary Counsel, for relator.

---

THE STATE OF OHIO, APPELLEE, *v.* ORR, APPELLANT.

THE STATE OF OHIO, APPELLEE, *v.* SMITH, APPELLANT.

[Cite as *State v. Orr* (2001), 91 Ohio St.3d 389.]

(No. 00–408—Submitted January 10, 2001—Decided May 2, 2001.)

FRANCIS E. SWEENEY, SR., J. From June 8, 1998 through June 20, 1998, the city of Dayton operated a system of driver's license checkpoints designed to identify and remove unlicensed drivers and drivers with suspended licenses from the roads. The checkpoints were set up at various locations in Dayton, including major thoroughfares and "target enforcement areas" —districts characterized by problems of traffic and crime. Upon arrival at a checkpoint site, the police would set up reflective signs that warned drivers of the upcoming checkpoint. The checkpoints were staffed by anywhere between eleven and thirteen officers. Several police cruisers were also present at the checkpoints.

As cars entered the checkpoints, they would be stopped according to some pattern that varied according to the amount of traffic on the road. If traffic was particularly light, every car would be stopped. Drivers who were stopped at these checkpoints were immediately advised of the purpose of the checkpoint and were asked to produce their driver's licenses. Drivers who produced a valid license would have their licenses returned to them along with a pamphlet explaining the checkpoint program and thanking them for their cooperation. The length of detention for those possessing a valid driver's license was usually about forty-five seconds.

Drivers who were unable to produce a valid driver's license had their names, dates of birth, and Social Security numbers entered into the officers' computers to check whether they possessed a valid license. If the computer showed that a driver was properly licensed and was not wanted by the police for any reason, the driver would be given the pamphlet, thanked, and released back into traffic. This entire process would take an additional two minutes or so to complete. Drivers without a valid license were cited for the violation, which added approximately ten minutes to the overall length of detention.

On June 17, 1998, appellant Magus Orr was stopped at a driver's license checkpoint and cited for driving without a license in violation of R.C. 4507.02(A)(1). That same night, appellant Andre Smith was stopped at a driver's license checkpoint at another location. Smith was cited for driving without a license in violation of R.C. 4507.02(A)(1), operating a motorcycle without the required endorsement in violation of R.C. 4507.02(A)(3), driving with expired license plates in violation of R.C. 4503.21, and operating a motorcycle without a helmet—required for novice riders—in violation of R.C. 4511.53.

Both of the appellants pleaded not guilty. Each appellant also filed a motion to suppress, claiming that his seizure was unconstitutional under the Ohio and United States Constitutions and that all evidence obtained as a result of his seizure should be suppressed. The trial court granted appellants' motions to suppress. The court concluded that because the state had offered no evidence to suggest that the driver's license checkpoints were a necessary or effective means of promoting roadway safety, they constituted an unreasonable search and seizure under the Ohio and United States Constitutions. The state appealed the trial court's decisions to the Second District Court of Appeals. In a consolidated case, the court of appeals reversed the trial court, concluding that driver's license checkpoints are a reasonable method by which to deal with the public danger posed by unlicensed drivers. Orr and Smith filed a joint notice of appeal. The cause is now before this court upon our allowance of a discretionary appeal.

We are asked to decide whether Dayton's driver's license checkpoint program violated the search and seizure provisions of the Ohio and United States Constitutions. For the reasons that follow, we sustain the program's constitutionality.

The Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Section 14, Article I of the Ohio Constitution, which contains language nearly identical to its federal counterpart, also prohibits unreasonable searches and seizures.[1] Because Section 14, Article I and the Fourth Amendment contain virtually identical language, we have interpreted the two provisions as affording the same protection. See *State v. Robinette* (1997), 80 Ohio St.3d 234, 238, 685 N.E.2d 762, 766–767. The search and seizure provisions of the Ohio and United States Constitutions are implicated in this case because a vehicle stop at a highway checkpoint constitutes a "seizure" within the meaning of the Ohio and United States Constitutions even though the purpose of the stop is limited and the resulting detention brief. *Delaware v. Prouse* (1979), 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667.

A number of federal and state courts have upheld the seizure of motorists at driver's license checkpoints. See, *e.g.*, *United States v. McFayden* (C.A.D.C.

---

1. Section 14, Article I of the Ohio Constitution provides:

  "The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized."

1989), 865 F.2d 1306; *United States v. Prichard* (C.A.10, 1981), 645 F.2d 854; *LaFontaine v. State* (1998), 269 Ga. 251, 497 S.E.2d 367; *State v. Cloukey* (Me.1985), 486 A.2d 143; *State v. Grooms* (1997), 126 N.C.App. 88, 483 S.E.2d 445. Although the United States Supreme Court has never fully considered the constitutionality of a driver's license checkpoint, it has repeatedly suggested in *dicta* that it would uphold properly administered driver's license checkpoints. For instance, in *Prouse,* the United States Supreme Court held that the Fourth Amendment prohibits a police officer from arbitrarily stopping an automobile for the sole purpose of checking the driver's license and registration. The court stressed, however, that this holding did not preclude states from developing methods for spot checks, including the "[q]uestioning of all oncoming traffic at roadblock-type stops." *Prouse,* 440 U.S. at 663, 99 S.Ct. at 1401, 59 L.Ed.2d at 673–674. Similarly, in *Indianapolis v. Edmond* (2000), 531 U.S. 32, ——, 121 S.Ct. 447, 457, 148 L.Ed.2d 333, 347, the Supreme Court invalidated drug interdiction checkpoints implemented primarily to uncover evidence of criminal wrongdoing but cautioned that its decision did nothing to alter the constitutional status of driver's license checkpoints.

The United States Supreme Court's cases generally accord more Fourth Amendment protection to persons who are subjected to roving-patrol stops than to those who are stopped at roadblock, or checkpoint-type, stops like that involved in the case at bar. The different treatment of checkpoint and roving-patrol stops makes sense, given the essential purpose underlying the Fourth Amendment. The Fourth Amendment "impose[s] a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order ' "to safeguard the privacy and security of individuals against arbitrary invasions." ' " (Footnote omitted.) *Prouse,* 440 U.S. at 653–654, 99 S.Ct. at 1396, 59 L.Ed.2d at 667, quoting *Camara v. Mun. Court of San Francisco* (1967), 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930, 935. The crucial distinction between roving-patrol stops and checkpoint stops is the degree to which they intrude upon motorists' privacy and sense of security. "[T]he subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop." *United States v. Martinez–Fuerte* (1976), 428 U.S. 543, 558, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116, 1128. "At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion." *United States v. Ortiz* (1975), 422 U.S. 891, 894–895, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623, 628. Many motorists accept checkpoint stops as incidental to highway use. *Martinez–Fuerte,* 428 U.S. at 561, 96 S.Ct. at 3084, 49 L.Ed.2d at 1130, fn. 14.

In determining the constitutionality of a police checkpoint, courts evaluate the following three factors: (1) the particular checkpoint's intrusion on privacy, (2)

the state's interest in maintaining the checkpoint, and (3) the extent to which the checkpoint advances the state interest. *Michigan Dept. of State Police v. Sitz* (1990), 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412. The United States Supreme Court has relied upon this analysis in upholding sobriety checkpoints—roadblocks at which drivers are checked for being under the influence of alcohol or mind-altering drugs—and roadblocks designed to intercept illegal immigrants. See *id.* (sobriety checkpoints); *Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (immigration checkpoints). The courts of several jurisdictions have extended the analysis to cases involving driver's license checkpoints. See, *e.g.*, *McFayden*, 865 F.2d 1306; *Cloukey*, 486 A.2d 143. We agree with those jurisdictions that have concluded that the analysis employed by the United States Supreme Court in its cases on sobriety and immigration checkpoints is appropriate for review of driver's license checkpoints. Therefore, we hold that in determining the constitutionality of a driver's license checkpoint, a court must evaluate, on a case-by-case basis, the checkpoint's intrusion on privacy, the state's interest in maintaining the checkpoint, and the extent to which the checkpoint advances the state interest. Applying this three-pronged analysis, we find that Dayton's driver's license checkpoints were consistent with the search and seizure provisions of the Ohio and United States Constitutions.

Like most checkpoint stops, Dayton's driver's license checkpoints did not greatly intrude upon travelers' sense of privacy. Drivers approaching these checkpoints were warned in advance of their presence. At the checkpoint, drivers could see that they were not the only ones being stopped. Visible signs of the officers' authority were everywhere. Each checkpoint was manned by at least eleven officers, with police cruisers present. Drivers who were stopped were immediately advised of the purpose of the stop. Most of those possessing a valid license were sent on their way after only about forty-five seconds. Those who had a valid license but could not produce it at the checkpoint were dispatched after only a few minutes. Even those driving without a valid license were detained for only ten minutes or so. Every driver stopped at one of Dayton's driver's license checkpoints was given a pamphlet explaining the checkpoint program and thanking him or her for cooperating. Clearly, these checkpoints constituted a very limited intrusion into travelers' privacy and sense of security.

Weighing against this minimal intrusion on privacy is the state's vital interest in using driver's license checkpoints to identify unlicensed drivers. The state has an interest in ensuring that only those qualified to do so are permitted to operate motor vehicles and hence that licensing requirements are being observed. *Prouse*, 440 U.S. at 658, 99 S.Ct. at 1398, 59 L.Ed.2d at 670. "Automobile licenses are issued periodically to evidence that the drivers holding them are sufficiently familiar with the rules of the road and are physically qualified to

operate a motor vehicle." *Id.* See, also, R.C. 4507.11.[2] As the court of appeals noted, "Persons who are too young or too old to drive pose a threat to the public safety." *State v. Smith* (Jan. 14, 2000), Montgomery App. Nos. 17475, 17476 and 17477, unreported, at 24, 2000 WL 20882. "Persons who have had their licenses suspended for convictions of operating a motor vehicle while under the influence of alcohol often disregard their suspensions and drive anyway, endangering the public." *Id.* In short, the state has a critical interest in protecting its citizens from drivers who either are not qualified to drive or have been forbidden to drive because of a record of driving offenses.[3]

Compounding the danger to the public from unlicensed drivers is the fact that much of the danger is hidden from plain view. While many types of dangerous motorists—drunk drivers, for example—exhibit erratic driving, the unlicensed driver often displays no observable characteristics. *Cloukey,* 486 A.2d at 147. Police officers on roving patrol cannot pull over a vehicle for the sole purpose of checking the driver's license and registration. *Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660. Therefore, without checkpoints, the only way in which police can identify an unlicensed driver is by waiting for the driver to commit a driving offense. *Cloukey,* 486 A.2d at 147. In at least some instances, the offense would not even have occurred had the offending driver been detected earlier and been removed from the roadways.

The final consideration in our three-pronged analysis is the extent to which the driver's license checkpoints advanced the state interest. This requires us to consider the Dayton program's effectiveness in identifying unlicensed drivers.

In one two-week period, the Dayton police stopped 2,110 motorists and issued 224 traffic citations, resulting in a citation rate of approximately 10.6 percent. By constitutional standards, this effectiveness rate of 10.6 percent is quite substantial. Although there was no evidence of how many of these citations were related to licensing, even if only a fraction of the citations were issued for driving without

---

MOYER, C.J., DOUGLAS, RESNICK, PFEIFER and LUNDBERG STRATTON, JJ., concur. COOK, J., concurs in judgment.

---

*Julia L. McNeil*, Dayton Director of Law, *John J. Scaccia*, Chief Administrative Counsel, and *Deirdre Logan*, Acting Chief Prosecutor, for appellee.

*Carl G. Goraleski* and *Anthony R. Cicero*, Assistant Public Defenders, for appellants.

*Betty D. Montgomery*, Attorney General, *David M. Gormley*, Associate Solicitor, and *David V. Patton*, Assistant Solicitor, urging affirmance for *amicus curiae* Attorney General of Ohio.

*Barry M. Byron, Stephen L. Byron* and *John Gotherman*, urging affirmance for *amicus curiae* Ohio Municipal Attorneys Association.

*Flanagan, Lieberman, Hoffman & Swaim* and *Richard Hempfling*, urging reversal for *amicus curiae* American Civil Liberties Union of Ohio Foundation.