Mary **SNYDER, et al., Plaintiffs**

v.

**GUARDIAN AUTOMOTIVE PRODUCTS, INC.,**
Defendant

No. 3:02–CV–7497.

United States District Court,
N.D. Ohio,
Western Division.

Oct. 1, 2003.

Patricia Horner, Toledo, OH, for Mary A. Snyder, Crystal Thiery, by and through her next friend and legal guardian, Mary A. Snyder, DeAnna Thiery, by and through her next friend and legal guardian, Plaintiffs.

Carrie L. Sponseller, Thomas A. Dixon, Eastman & Smith, Toledo, OH, Nicole Porter, Auburn Hills, MI, for Guardian Automotive Products, Inc., Defendant.

## ORDER

CARR, District Judge.

Plaintiff Mary Snyder brings this suit against defendant Guardian Automotive Products, Inc., claiming hostile work environment in violation of Ohio Revised Code § 4112 and Ohio public policy, negligent hiring and supervision, and loss of parental consortium. This case was removed to this court on the basis of diversity, therefore this court has jurisdiction pursuant to 28 U.S.C. § 1441. Pending is defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56. For the following reasons, defendant's motion shall be granted.

## BACKGROUND

Mary Snyder ("Snyder") was hired by Guardian Automotive Products, Inc. ("Guardian") on November 18, 1998. Snyder claims that she first experienced the alleged harassment in early 1999.

### A. Supervisor Scott Grubel

Scott Grubel ("Grubel") was Snyder's supervisor in 1999. Snyder had several complaints about Grubel. First, Snyder claims that Grubel denied her request to cancel overtime hours, but allowed another female co-worker to cancel her hours. Second, Snyder claims that Grubel falsely accused her of talking with other co-workers when she was actually performing training, a requirement of her job position. Third, Snyder states that Grubel accused

her of violating the dress code by wearing a shirt that revealed her navel. Snyder claims that although other women dressed in similar attire, Grubel stated that she could not dress in such a way because she "had more than other women" (Doc. 22, at p. 4). Grubel then asked Snyder to change her clothing. Snyder became upset with this request, as she thought that she was being forced to go home and change her clothing which would result in her losing her attendance bonus. Finally, Snyder claims that Grubel told "dumb blond jokes" in her presence and never had anything nice to say to her (Doc. 22, at p. 4).

In response to Grubel's alleged actions, Snyder voiced her complaints to supervisor Dale Smith. Dale Smith then informed the human resources department and Grubel's supervisor, Steve Mawer ("Mawer"), of Snyder's complaints. Mawer conducted an investigation of Snyder's complaints. Deciding that Grubel acted inappropriately, Mawer issued him a written warning. Grubel was subsequently transferred to another department and was eventually terminated.

## B. Incident Report

On September 14, 2000, Snyder was working on the line with a co-worker, Cathy Biglin ("Biglin"). Snyder and Biglin began to argue about the work they were performing. After the argument, Snyder approached her husband, Michael Snyder, also a Guardian employee, about the incident. Michael Snyder then approached Biglin about the argument asking her why she had been screaming at his wife. Biglin confronted Snyder again, this time about Snyder telling her husband about the incident. Michael Snyder also again approached Biglin.

Jeff Evans ("Evans") conducted an investigation into the incident and found that all parties involved in the argument used inappropriate language and violated Guardian's Code of Conduct. Each employee, Mary Snyder, Michael Snyder, and Cathy Biglin, was disciplined. Due to prior disciplinary problems, Biglin was terminated after this incident, while Mary and Michael Snyder received disciplinary actions in their files.

When a supervisor discussed the issue with Michael and Mary Snyder, both refused to sign the disciplinary actions. Snyder claims that the incident report described the argument as a physical confrontation, rather than a verbal confrontation. Both employees were told that the reports would be placed in their files whether they signed them or not. Brian Hyde, the plant manager, then met with Snyder to discuss her reservations about signing the report. Hyde explained that it was the company's policy that employees sign their incident reports to illustrate that they are aware of the report. Snyder then agreed to sign the report.

Snyder claims that Guardian supervisors "repeatedly tried to coerce [her] to sign an incident report concerning a co-worker ... which was inaccurate but that would have more likely than not resulted in the co-worker's termination" (Doc. 1, at ¶ 7(a)). In addition, she claims that her signature was obtained in a "misleading manner" and that her supervisors "involved [her] husband in the matter ... to coerce [her] into signing the report" (Doc. 1, at ¶ 7(a)).

## C. Supervisor John Schwartz

As Snyder and her husband would arrive at work together, supervisor John Schwartz ("Schwartz") stood under a clock and repeatedly told the couple that they were late. Although Schwartz threatened to report their alleged tardiness, Snyder never received any notice of an employee contact or corrective action. Michael Snyder did complain to John Curtis about Schwartz's behavior. Snyder claims that Schwartz eventually found out about the

complaint and threatened that he would fire Snyder if he found out that she had complained about him again.

### D. Computer Messages

On December 20, 2000, Snyder received three to four separate harassing messages on three computers that she was using. One message stated "stop acting like you're actually working," which Snyder thought was a joke. However, after the third message Snyder became frightened because she felt that she was being watched. Supervisor Jeff Evans was informed of the messages, but the sender was not determined. Snyder claims that these messages interfered with her job performance.

### E. Snyder's Work Injury

After injuries to her finger, hand, arm, and shoulder while on the cutting line, Snyder was assigned to light duty work by a physician for six weeks. Snyder had work restrictions which limited the amount of weight she could lift and prevented her from overhead work, among other things. Snyder claims that despite the work restrictions, her supervisors continued to assign jobs which required working above shoulder level, bending low, and lifting ladders. Snyder also claims that another male employee, who was also on light duty work restrictions, was not assigned similar tasks. Snyder claims that he was only assigned jobs which required him to walk around the plant while carrying a clipboard.

### F. Tow Motor Training

Snyder alleges that she was forced to take a tow motor operator licensing test on three occasions and even after passing the test, Jeff Evans required that he walk with her whenever she operated the machine. Snyder claims that male employees only had to take the test once and were not required to have supervision when operating the machinery.

### G. Termination of Snyder's Employment

On March 6, 2001, Snyder was assigned to throw spall vinyl in a room of the factory. A co-worker working with Snyder accused Snyder of trying to hit her with the vinyl. Snyder was later approached by Jeff Evans and the director of human resources about the incident. Snyder claims that the co-worker's allegation was inaccurate, and threatened to file harassment charges against other employees. Snyder stated that she "might as well quit if I am going to be drug into the office every day and you won't let me file against them" (Doc. 22, at p. 12). Snyder then stormed out of the office. Jeff Evans eventually found Snyder sitting in her car and asked her to return to the office so that they could finish their conversation. Snyder eventually returned and continued the conversation. As Snyder was leaving the office, Jeff Evans asked her if she would return the next day. Snyder did not indicate whether she would return to work. The next day Snyder arrived at work, but was informed that she could not return to her job because she had resigned.

### STANDARD OF REVIEW

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material facts. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party, who "must set forth specific facts showing that

there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

In deciding the motion for summary judgment, the evidence of the non-moving party will be accepted as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Servs.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## DISCUSSION

### A. Hostile Work Environment

Section 4112.02(C)(2) of the Ohio Revised Code states that it shall be an unlawful discriminatory practice for an employer to "adversely effect the ... employment conditions of any person as an employee because of race, color, religion, sex, national origin, disability, age, or ancestry." The Ohio Supreme Court

has held that in cases involving alleged violations of § 4112, courts may use federal case law interpreting Title VII of the Civil Rights Act of 1964 as guidance. *Little Forest Medical Center v. Ohio Civil Rights Comm'n,* 61 Ohio St.3d 607, 609, 575 N.E.2d 1164 (1991) ("[R]eliable, probative, and substantial evidence in an employment discrimination case brought pursuant to R.C. Chapter 4112 means evidence sufficient to support a finding of discrimination under Title VII.").

■■■ The U.S. Supreme Court has established that a hostile work environment constitutes sexual harassment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). A hostile work environment is created when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor,* 477 U.S. at 65, 67, 106 S.Ct. 2399). Courts examine three main factors when examining alleged hostile work environments: "(1) was the conduct severe or pervasive so as to alter the terms and conditions of employment? (2) was the conduct offensive to the plaintiff? (3) would the conduct have been offensive to the reasonable person or victim?" Lex. K. Larson, *Employment Discrimination* § 46.04 (2d ed.1994).

■■■ In assessing whether an environment is "severe and pervasive," courts have considered the "totality-of-the-circumstances[.]" *Williams v. General Motors Corp.,* 187 F.3d 553, 562 (6th Cir. 1999). Considerations "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere of-

fensive utterance; and whether it unreasonably interferes with an employee's work performance". *Harris*, 510 U.S. at 23, 114 S.Ct. 367. Furthermore, it must be shown that an employee was subjected to such treatment because of her sex. Although it is possible for non-sexual conduct to be considered in a hostile work environment situation, it must "be shown that but for the employee's sex, [s]he would not have been the object of harassment." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir.2000). This non-sexual conduct must reflect "anti-female animus, and therefore could be found to have contributed significantly to the hostile environment." *Williams*, 187 F.3d at 565 (quoting *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 905 (1st Cir.1988)).

■ When the alleged claim is based on a supervisor's actions, a plaintiff must establish the supervisor's discriminatory practice, and then show that the supervisor's actions resulted in a "tangible employment action." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). This "tangible employment action" may include "discharge, demotion, or undesirable reassignment." *Id.* However, an employer can "escape liability only if it took reasonable care to *prevent and correct* any sexually harassing behavior." *Williams*, 187 F.3d at 561. When the claim revolves around the actions of a co-worker, it must be shown that the employer "knew or should have known of the alleged sexual harassment and failed to implement prompt and appropriate corrective action." *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir.1999).

■ In the present action, plaintiff claims that she was subjected to a hostile work environment on the basis of her gender. Plaintiff fails, however, to establish that those incidents occurred because of her gender. Moreover, plaintiff has not shown that the hostile environment she alleges resulted in tangible employment action or adversely affected her working conditions.

Regarding the conduct of supervisor Scott Grubel, it is undisputed that once plaintiff complained about his conduct, the company assigned him elsewhere. By transferring Grubel and eventually terminating his employment, Guardian acted entirely properly and met its obligations under the law.

The other incidents included in plaintiff's complaint show no gender-based animus. Plaintiff has not demonstrated that her similarly situated male co-workers were treated differently than she. Regarding the incident report after the Biglin confrontation, plaintiff gives no evidence that her husband was treated differently than she. Furthermore, there is no indication that her husband continued in his refusal to sign the report.

Similarly, Schwartz's threat to fire Snyder and the annoying computer messages sent to Snyder reflect no gender-based motive or bias.

Regarding plaintiff's alleged mistreatment while on light work duty, it is not evident that this was based on gender. Plaintiff complains that a male co-worker merely had to walk around with a clipboard while on light work duty. Plaintiff, however, has presented no proof that her co-worker's restrictions were comparable to hers. She has failed, accordingly, to meet her burden of showing that she and the male co-worker were similarly situated. *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir.1992). Plaintiff shows no adverse effect on her working conditions due to her light work assignments other than dissatisfaction with her situation.

Moreover, plaintiff has not established that men were treated differently for tow motor training. Even if there was a dis-

crepancy in the way plaintiff was treated when she was trained, there was no effect on her pay rate and thus the training had no adverse impact on her working conditions.

Finally, in response to plaintiff's resignation, there is no proof that a male employee would have been treated differently in the same situation. Thus, there is no indication that there was any gender-based animus in the company's refusal to allow her to return to work. Furthermore, it was a reasonable assumption for her supervisors to believe that plaintiff resigned, as she gave no definitive answer, when asked, about whether she would return to work the next day.

In light of the totality of the circumstances, plaintiff's claims are not actionable. A rational trier of fact could not find any gender-based discrimination constituting a hostile work environment.

### B. Violation of Public Policy

■ The Ohio Supreme Court has stated that "public policy warrants an exception to the employment-at-will doctrine when an employee is discharged ... for a reason which is prohibited by statute." *Greeley v. Miami Valley Maintenance Contractors, Inc.,* 49 Ohio St.3d 228, 234, 551 N.E.2d 981 (1990). The Court clarified this statement by explaining that "to state a claim of wrongful discharge in violation of public policy, a plaintiff must allege facts demonstrating that the employer's act of discharging contravened a 'clear public policy.'" *Painter v. Graley,* 70 Ohio St.3d 377, 383, 639 N.E.2d 51 (1994). Moreover, the Court held in *Collins v. Rizkana,* 73 Ohio St.3d 65, 652 N.E.2d 653 (1995) that sexual harassment violates clear Ohio public policy.

In the case at bar, however, the plaintiff has failed to establish a prima facie case of sexual harassment. Because her "hostile environment" claim fails, plaintiff's allega-

tion that her termination violates Ohio public policy has no merit.

### C. Negligent Hiring and Supervision

■ A party seeking to prevail on a claim for negligent hiring, supervision, or retention of an employee by an employer must show:

(1) the existence of an employment relationship;

(2) the employee's incompetence;

(3) the employer's actual or constructive knowledge of such incompetence;

(4) the employee's act or omission causing the plaintiff's injuries; and

(5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries.

*Douglass v. Salem Cmty. Hosp.,* 153 Ohio App.3d 350, 366, 794 N.E.2d 107 (2003).

It is undisputed that plaintiff was an employee of defendant. Plaintiff has not provided specific allegations, however, that demonstrate the incompetence of any of her supervisors, nor has she alleged that Guardian had actual or constructive knowledge of any supervisory incompetence.

Plaintiff's allegations regarding Scott Grubel indicate that, while his behavior may have been inappropriate, supervisor Dale Smith acted properly in transferring, and later terminating, Grubel.

The allegation that supervisor John Schwartz threatened to report plaintiff and her husband for being late, even when they were not late, indicates only that Schwartz may have disliked or disfavored plaintiff, not that he was incompetent and that Guardian knew of any incompetence.

Plaintiff states that supervisor Jeff Evans failed to discover who sent voyeuristic messages to her, but she does not allege that Evans' incompetence was the reason for his failure to discover the perpetrator. Plaintiff has likewise failed to offer specific

allegations of incompetence regarding Evans walking next to her as she trained on the tow motor or his investigation into the spat vinyl incident that ultimately led to her termination. If anything, Evans' actions indicate a supervisor who took extra precautions in training and properly investigated employee complaints.

Plaintiff has not revealed any specific facts alleging the incompetence of her supervisors, or that Guardian knew of their incompetence and failed to act properly on that knowledge. Therefore, plaintiff's claim for negligent supervision and hiring fails.

### D. Loss of Parental Consortium

 Ohio recognizes the rights of both minor and adult children to recover for loss of parental consortium. *Rolf v. Tri State Motor Transit Co.*, 91 Ohio St.3d 380, 383, 745 N.E.2d 424 (2001). The claim is intended to compensate the child "for harm done or for losses suffered as a result of injury to the parent and the parent-child relationship." *Id.* at 382, 745 N.E.2d 424.

Plaintiff's daughters allege loss of their mother's consortium due to her reduction in income when her employment with defendant was terminated. Their claim is derivative of plaintiff's. Because plaintiff's claims for violation of O.R.C. § 4112, violation of Ohio public policy, and negligent supervision and hiring fail, the claim for loss of parental consortium must also fail.

### CONCLUSION

It is, therefore,

ORDERED THAT defendant Guardian's motion for summary judgment be, and hereby is, granted as to all claims.

So ordered.