Dr. Karen ROBERTS, Petitioner,

v.

Lainie and Casey WILLIAMSON, individually and as next friends of Courtnie Williamson, Respondents.

Dr. Karen Roberts, Petitioner,

v.

Lainie and Casey Williamson, individually and as next friend of Courtnie Williamson, Respondents.

Nos. 01–0765, 01–0766.

Supreme Court of Texas.

Argued April 17, 2002.

Decided July 3, 2003.

Robert Lee Galloway, Mary Olga Ferguson and Richard W. Bass, Thompson & Knight, Houston, for Petitioner.

Rex A. Nichols, Jr., Rex A. Nichols, Nichols & Nichols, Longview, Karen Debiasse Bishop, Bishop & Bishop, P.C., Gilmer, for Respondent.

Chief Justice PHILLIPS delivered the opinion of the Court, joined by Justice HECHT, Justice ENOCH, Justice OWEN, Justice SMITH and Justice WAINWRIGHT, and joined by Justice O'NEILL, Justice JEFFERSON, and Justice SCHNEIDER in all Parts except Part II.

In these consolidated cases involving two separate appeals in a medical malpractice action, we must decide an issue of first impression: whether Texas recognizes a common law cause of action for a parent's loss of consortium resulting from a non-fatal injury to a child. In addition, we consider whether the court of appeals erred in affirming the trial court's decision to admit certain expert testimony or in failing to apply prior settlements to reduce the damages award. We also consider whether the court of appeals erred in re-

versing the trial court's allocation of the ad litem's fee between the parties. In one opinion, the court of appeals concluded that the common law recognizes a parent's claim for loss of filial consortium and that the trial court had not erred in admitting certain expert testimony or in refusing to apply a settlement credit when calculating the defendant physician's percentage of responsibility. 52 S.W.3d 343. In a separate opinion, the court of appeals concluded that the trial court had erred in taxing the guardian ad litem's fee as costs evenly between the parents and the defendant physician, holding that the physician should pay all these costs. 52 S.W.3d 354. Both judgments have been consolidated in this appeal. While we disagree that parents may recover for the loss of filial consortium, we agree with the remainder of the court of appeals' judgments. We therefore render judgment, affirming in part and reversing in part.

## I

The day after her birth, Courtnie Williamson began suffering from severe acidosis, a condition with a number of serious complications, including damage to the heart and brain. Dr. Roger Fowler, the attending physician, called Dr. Karen Roberts, the only consulting pediatrician at Laird Memorial Hospital in Kilgore, Texas, and advised her that Courtnie was in respiratory distress. Dr. Roberts arrived from Longview approximately forty-five minutes later and began treating Courtnie. Shortly thereafter, Dr. Roberts and Dr. Fowler placed Courtnie on a pediatric ventilator. The ventilator was not functioning properly, however, and Courtnie did not receive needed oxygen for several minutes.

About one hour after Dr. Roberts' arrival, a colleague suggested that sodium bicarbonate should be administered to counteract Courtnie's worsening acidosis. Two hours later, after consulting with a neonatologist in Shreveport, Dr. Roberts followed this advice, and Courtnie began to improve. Not long thereafter, Courtnie was transported to Schumpert Medical Center in Shreveport. Courtnie now has a permanent shunt implanted in her skull to drain fluids to her abdomen. She suffers from a weakened left side, requires braces to walk, has significant scarring, and is developmentally delayed.

Courtnie's parents, Lainie and Casey Williamson, individually and on behalf of their daughter, sued Dr. Roberts, Laird Memorial Hospital, Dr. Mark Miller (the on-call physician), and Dr. Fowler. They contend that the malfunctioning ventilator, the delay in administering sodium bicarbonate, and the failure to immediately transfer Courtnie to a better-equipped hospital, combined to proximately cause Courtnie's injuries. The trial judge appointed a guardian ad litem to represent Courtnie's interests.

The Williamsons' claims against the hospital, Dr. Fowler, and a treating physician who was not named as a defendant were settled for $468,750. The claims against Dr. Roberts and Dr. Miller proceeded to trial. At trial, Dr. Frank McGehee, a board-certified pediatrician, testified that Dr. Roberts was negligent in delaying Courtnie's transfer to a hospital equipped to treat her condition and in failing to administer sodium bicarbonate sooner. Dr. McGehee testified that Dr. Roberts' negligence proximately caused Courtnie to suffer from mental retardation, anti-social behavior, and hemiplegia, a partial paralysis of one side of body caused by an injury to the brain.

The jury apportioned responsibility for Courtnie's injuries as follows: 85 percent to the settling parties, 15 percent to Dr. Roberts, and zero percent to Dr. Miller. The jury awarded $3,010,001 in damages,

including $75,000 to the parents for past loss of filial consortium and one dollar for future loss thereof. The trial court rendered judgment on the verdict, ordering Dr. Roberts to pay $451,500.15, or 15 percent of the entire award, with no deduction for the settlements. The trial court also awarded the ad litem [1] a fee of $21,405.69, which it divided equally between Dr. Roberts and the Williamsons.

Dr. Roberts and the Williamsons filed separate appeals. Dr. Roberts urged that (1) Texas law does not permit a parent to recover for loss of consortium for non-fatal injuries to a child, (2) Dr. McGehee was not qualified to testify as an expert on the cause and effect of Courtnie's neurological injuries, (3) no evidence supported the jury's award of past and future medical expenses, and (4) the trial court erred in not applying a settlement credit before apportioning damages. The Williamsons complained only about having been taxed with one-half of the ad litem's fee. The court of appeals rejected Dr. Roberts' appeal and affirmed the trial court's award of damages against her. 52 S.W.3d at 354. However, the court of appeals agreed with the Williamsons' separate appeal, reversing the trial court and rendering judgment that Dr. Roberts pay the full amount of the ad litem's fee. *Id.* at 357.

In this Court, Dr. Roberts has filed two separate appeals, complaining about both judgments. We granted both petitions for review and consolidated the two appeals to decide four issues: (1) whether Texas common law recognizes a parent's claim for loss of consortium when a child is seriously, but not fatally, injured; (2) whether a medical expert, who is not a neurologist, is nevertheless qualified to testify about the cause and effect of a child's neurological injuries; (3) whether a defendant, who is not jointly and severally liable, is entitled to a settlement credit before the application of her percentage of responsibility; and (4) whether there is evidence of good cause sufficient to tax the prevailing party with part of the ad litem's fee as costs.

## II

In *Reagan v. Vaughn,* 804 S.W.2d 463, 468 (Tex.1990), we held that a child is entitled to seek damages for loss of consortium when a parent suffers a serious, permanent, and disabling injury. We equated the child's relationship to the parent to that of one spouse to another, a relationship for which we had previously recognized consortium rights. *Id.* at 465–66 (citing *Whittlesey v. Miller,* 572 S.W.2d 665, 667–68 (Tex.1978)). We further noted the vulnerable and dependent role of the child in this relationship and the profound harm that might befall a child who has been deprived of a parent's love, care, companionship, and guidance. *Id.* at 466 (citing *Villareal v. State,* 160 Ariz. 474, 774 P.2d 213, 217 (1989)).

The court of appeals concluded that because of our emphasis in *Reagan* that the parent-child relationship deserved special protection, we must have intended for parents to have consortium rights in the relationship as well. 52 S.W.3d at 352. The court suggests that the parent-child relationship is a reciprocal one, like husband and wife, and that all parties deserve the

---

1. Although the trial court and parties refer to the ad litem as an attorney ad litem, the court of appeals concluded that she was in fact a guardian ad litem appointed under Texas Rule of Civil Procedure 173. 52 S.W.3d 354, 355 n. 1. Rule 173 provides that when a minor is a party to a suit and is represented by a next friend whose interests may be adverse to the minor, "the court shall appoint a guardian ad litem for [the minor] and shall allow [her] a reasonable fee for [her] services to be taxed as a part of the costs." TEX.R. CIV. P. 173.

same protection. 52 S.W.3d at 352. Dr. Roberts counters that *Reagan* does not extend so far, and that the loss to a child caused by a serious injury to the parent is uniquely different from that to a parent of a seriously injured child.

We have not previously considered whether parents have a claim for loss of consortium in non-fatal injury cases, but some courts of appeals have assumed that such a claim is viable. *See Schindler Elevator Corp. v. Anderson*, 78 S.W.3d 392, 414 (Tex.App.-Houston [14th Dist.] 2001, pet. filed); *Enochs v. Brown*, 872 S.W.2d 312, 322 (Tex.App.-Austin 1994, no writ); *see also Parkway Hosp., Inc. v. Lee*, 946 S.W.2d 580, 590 (Tex.App.-Houston [14th Dist.] 1997, writ denied). We recognize the sympathetic and, on the surface, logical appeal to extending consortium rights to parents as well as children. But several states that have recognized a child's right to loss of consortium have denied the parents any reciprocal right, including two of the first states in the nation to recognize the child's right. *See Norman v. Mass. Bay Transp. Auth.*, 403 Mass. 303, 529 N.E.2d 139, 141–42 (1988);[2] *Sizemore v. Smock*, 430 Mich. 283, 422 N.W.2d 666, 667–74 (1988).[3] These courts have concluded that the child's interest deserves greater protection because of the child's singular emotional dependency on the parents. The Massachusetts Supreme Court explained this distinction in *Norman* as follows:

> In the ordinary course of things the dependence of spouses on one another for love and support is found to the same degree in no other relationship

except, perhaps, in the relationship of a minor child to his or her parents.

\* \* \*

> Although parents customarily *enjoy* the consortium of their children, in the ordinary course of events a parent does not *depend* on a child's companionship, love, support, guidance, and nurture in the same way and to the same degree that a husband depends on his wife, a wife depends on her husband, or a minor or disabled adult child depends on his or her parent. Of course, it is true that such dependency may exist in a particular situation, but it is not intrinsic to the parent-child relationship as is a minor child's dependency on his or her parents and as is each spouse's dependency on the other spouse.

*Norman*, 529 N.E.2d at 140–41.

The Wyoming Supreme Court has also rejected a parent's right to consortium damages while recognizing the child's right. Some years after rejecting a parent's claim for consortium in *Gates v. Richardson*, 719 P.2d 193, 201 (Wyo.1986), the Wyoming Supreme Court concluded that the child's interest in the relationship was so different that it did deserve protection:

> In our society the minor child requires his or her parent's nurturing, guidance, and supervision. The child is uniquely dependent upon the parent for his or her socialization, that maturation process which turns a helpless infant into an independent, productive, responsible human being who has an opportunity to

---

**2.** *Ferriter v. Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 413 N.E.2d 690 (1980) (child's consortium right recognized). A parent in Massachusetts presently has a statutory claim for loss of consortium. *See* Mass. Gen. Laws ch. 231, § 85X; *Monahan v. Town of Methuen*, 408 Mass. 381, 558 N.E.2d 951, 956 (1990).

**3.** *Berger v. Weber*, 411 Mich. 1, 303 N.W.2d 424 (1981) (child's consortium right recognized).

be a valuable, contributing member of our society. Without question, the child's relational interest with the parent is characterized by dependence. In contrast, the parent's relational interest with the child is not. In a real sense, the child is "becoming" and the parent "has become." Thus, the parent's loss of an injured child's consortium is different in kind from the child's loss of an injured parent's consortium. Viewed in this light, our refusal in *Gates* to recognize the parent's claim is inapposite to the legal problem whether we recognize the child's claim.

*Nulle v. Gillette–Campbell County Joint Powers Fire Bd.,* 797 P.2d 1171, 1175 (Wyo.1990). The Vermont Supreme Court has similarly recognized that the "child is in a uniquely difficult position to make up for the loss of a parent." *Hay v. Med. Ctr. Hosp. of Vt.,* 145 Vt. 533, 496 A.2d 939, 942 (1985). It explained:

> While "an adult is capable of seeking out new relationships in an attempt to fill in the void of his or her loss, a child may be virtually helpless in seeking out a new adult companion. Therefore, compensation through the courts may be the child's only method of reducing his or her deprivation of the parent's society and companionship."

*Id.* (quoting *Theama v. City of Kenosha,* 117 Wis.2d 508, 344 N.W.2d 513, 516 (1984)).

We agree with these courts that the parent-child relationship is not reciprocal like husband and wife and that the child is the party to the relationship who needs special protection. We concede that serious injury to a child will have emotional consequences for the parents. Tort law, however, cannot remedy every wrong. Sound public policy requires an end at some point to the consequential damages that flow from a single negligent act. As

the New York Court of Appeals has explained: "Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree." *Tobin v. Grossman,* 24 N.Y.2d 609, 301 N.Y.S.2d 554, 249 N.E.2d 419, 424 (1969). Consequently, the law ordinarily denies recourse to those not directly injured by a negligent act, but whose injury is caused indirectly by the harm to another. There are exceptions to this general rule, including claims for loss of consortium. But all these exceptions have been narrowly cabined. Thus, while we have recognized that spouses and children can recover loss of consortium, we have concluded that siblings and step-parents cannot. *Compare Whittlesey,* 572 S.W.2d at 667–68 (spousal consortium), *and Reagan,* 804 S.W.2d at 466 (parental consortium) *with Ford Motor Co. v. Miles,* 967 S.W.2d 377, 383–84 (Tex.1998) (rejecting consortium claim for siblings and step-parent).

When recognizing a new cause of action and the accompanying expansion of duty, we must perform something akin to a cost-benefit analysis to assure that this expansion of liability is justified. *See, e.g., Bird v. W.C.W.,* 868 S.W.2d 767, 769 (Tex. 1994). The fundamental purposes of our tort system are to deter wrongful conduct, shift losses to responsible parties, and fairly compensate deserving victims. While the recognition of an additional layer of liability to the parent clearly shifts the loss, it is not at all clear that this additional layer of liability will produce corresponding benefits of deterrence or fair compensation. It is clear, however, that it will foster further uncertainty and widen the divergence in recoveries among similarly situated victims. Courts have generally been willing to tolerate more uncertainty in the calculation of damages when

necessary to compensate the primary tort victim. That pain and mental anguish defy objective valuation or that money damages are a poor palliative for catastrophic injury do not justify the denial of a monetary remedy to a victim who has been severely injured. But once courts have fairly compensated the primary victim, they should be more troubled about the difficulties in measuring intangible losses to secondary victims.

The case before us demonstrates the challenges presented to a fact-finder when awarding consortium damages. The Williamsons assert that the defendant's negligence caused their daughter to sustain massive brain damage, particularly to the right side of her brain, resulting in permanent and in all likelihood progressive neurological and behavioral problems. They submit that their daughter has and will continue to have difficulty controlling her emotions and will likely suffer from some degree of retardation. Her injuries, however, have not shortened her life expectancy. At the time of trial, the child was three years old. On this evidence, the jury concluded that the value of the "harm to the parent-child relationship"[4] during the first three years of the relationship was $75,000, while future harm to the relationship over several score years was only a dollar. As for the child's personal injury claim, the jury awarded, among other damages, $100,000 for past pain and mental anguish, $35,000 for past physical impairment, $750,000 for future pain and mental anguish, and $300,000 for future physical impairment. The jury apparently concluded that while the child's intangible losses would grow with time, her continuing impairment would have no substantial effect on the parent-child relationship in the future. Another jury after hearing the same evidence might well have reached a very different conclusion.

■ In *Reagan*, we were willing to let the system sort through these difficulties because of the perceived social importance in protecting the child's interests. Moreover, we concluded that " 'limiting the plaintiffs in the consortium action to the victim's children' " was a rational way to ensure the validity of these intangible losses. *Miles*, 967 S.W.2d at 384 (quoting *Reagan*, 804 S.W.2d at 466). That rationale, however, breaks down when we extend such rights to parents. Because the parent has a less dependent role than that of the child in the relationship, extending consortium rights here could logically lead to the recognition of such rights in other non-dependent relatives or even in close friends, given appropriate facts. *See Norman*, 529 N.E.2d at 141. But, like every other jurisdiction, we have already concluded that consortium should not be expanded to this extent. *See Miles*, 967 S.W.2d at 383–84. We therefore decline to extend a claim for loss of consortium to parents of children who have been seriously injured.

Some may argue that our refusal to extend consortium rights to parents cre-

---

4. The jury question asked what sum of money would fairly and reasonably compensate the parents "for the harm, if any, to the parent-child relationship as a result of the occurrences in question?" The jury was further instructed "that 'harm to the parent-child relationship' means *damage to the right of both parents and their child* to the affection, comfort, companionship, society, assistance, emotional support, and love necessary to a parent-

child relationship." (emphasis added). The defendant did not object to the instruction's apparent erroneous inclusion of the child's parental consortium claim, although the defendant did object to the issue on other grounds, i.e., its failure to include a predicate that the injury to the child must be serious, permanent, and disabling before a parent may recover filial consortium.

ates a paradox because we permit parents to recover consortium damages in wrongful death cases. *See Sanchez v. Schindler,* 651 S.W.2d 249, 251 (Tex.1983) (abolishing pecuniary loss rule). But there are reasons for distinction. Before abolition of the pecuniary loss rule, the wrongful death of a child did not ordinarily create pecuniary consequences for the negligent tortfeasor because the child was of little monetary value to the family. Abolishing this rule and permitting the "[r]ecovery for loss of affection and society in a wrongful death action thus fulfills a deeply felt social belief that a tortfeasor who negligently kills someone should not escape liability completely, no matter how unproductive his victim." *Borer v. Am. Airlines, Inc.,* 19 Cal.3d 441, 138 Cal.Rptr. 302, 563 P.2d 858, 865 (1977). But when the child survives, as here, so does the child's own cause of action against the tortfeasor. And if the primary victim of the accident may bring an action, there is no need to recognize actions by other family members to prevent the tortfeasor from escaping liability. Thus, our law is not inconsistent in recognizing certain intangible damages for secondary victims in death actions but not in personal injury actions.

■ But even if it were an anomaly to do so, we could not unify the rules for recovery of intangible damages in wrongful death and personal injury actions by any decision in this case. All statutory beneficiaries [5] under the Wrongful Death Act are entitled to recover intangible damages not only for loss of companionship but also mental anguish. *See Estate of Clifton v. S. Pac. Transp. Co.,* 709 S.W.2d 636, 639 (Tex.1986); *Moore v. Lillebo,* 722 S.W.2d 683, 685 (Tex.1986). These same parties, however, have a much more circumscribed

right to recover mental anguish damages when the family member survives. *See United Servs. Auto. Ass'n v. Keith,* 970 S.W.2d 540, 541–42 (Tex.1998) (per curiam) (bystander recovery). Thus, whether or not we were to recognize a right to filial consortium in this case, differences in the award of intangible damages for wrongful death and personal injury would persist. *See Reagan,* 804 S.W.2d 463, 489–90 (op. on rehearing) (Doggett, J., concurring and dissenting) (urging that close family members of a seriously injured person should also recover for mental anguish).

We conclude that no compelling social policy impels us to recognize a parent's right to damages for the loss of filial consortium. And, on balance, we believe that the common law is best served by the result we reach here. Accordingly, we disapprove of those cases holding or suggesting to the contrary. *See Schindler Elevator Corp.,* 78 S.W.3d at 414 (approving award of filial consortium); *Enochs,* 872 S.W.2d at 322 (recognizing parent's right to filial consortium); *see also Parkway Hosp., Inc.,* 946 S.W.2d at 590 (allowing filial consortium damages because error not preserved).

### III

Dr. Roberts next complains about the court of appeals' approval of the trial court's decision to allow Dr. McGehee, a board-certified pediatrician, to testify as an expert about matters beyond his expertise. Texas Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto

---

5. "An action to recover damages [for wrongful death] is for the exclusive benefit of the surviving spouse, children, and parents of the deceased." Tex. Civ. Prac. & Rem.Code § 71.004(a).

in the form of an opinion or otherwise." Tex.R. Evid. 702. While Dr. Roberts does not question Dr. McGehee's qualifications to testify about the appropriate standard of care, she argues that he was not qualified to render an opinion about the nature and effect of Courtnie's neurological injuries. Relying on our decision in *Broders v. Heise*, 924 S.W.2d 148 (Tex.1996), Dr. Roberts contends that the trial court abused its discretion when it admitted this neurological testimony. We disagree.

In *Broders*, the trial court excluded expert testimony from an emergency-room physician who was prepared to testify about the cause of death in a medical malpractice action. The patient had suffered a head injury during an assault and was thereafter admitted to a hospital for observation and treatment. The patient was released the next day by her attending physician but returned to the hospital a few hours later, complaining of an intense headache, nausea, and sensitivity to light. A neurosurgeon examined her this time and determined that she had a fractured skull, with bleeding and swelling in the brain. The swelling could not be controlled, and the patient died the next day.

The decedent's parents brought a wrongful death action against the hospital and three doctors. The defendants argued that the assault had caused an irreversible, untreatable, and fatal brain injury. No treatment, they said, whether negligent or not, could have been a cause in fact of the patient's death. The defendants presented expert testimony from two neurosurgeons to support their position. The plaintiff's expert would have testified that had the patient's head trauma been promptly diagnosed and treated during her first hospitalization, the patient would, in all medical probability, have survived. The court of appeals reversed and remanded, conclud-

ing that the trial court had erred in excluding this testimony. *Id.* at 148–51.

We held that the trial court had correctly excluded this testimony because the emergency-room physician was not qualified as an expert under Rule 702 "on the issue of cause·in fact." *Id.* at 153. While the emergency-room physician "knew both that neurosurgeons should be called to treat head injuries and what treatments they could provide, he never testified that he knew, from either experience or study, the effectiveness of those treatments in general, let alone in this case." *Id.* We further observed that a medical license does not automatically qualify the holder "to testify as an expert on every medical question." *Id.* at 152; *see also Christophersen v. Allied–Signal Corp.*, 939 F.2d 1106, 1112–1113 (5th Cir.1991) (inquiry is not simply whether expert has an M.D. degree, but also actual qualifications). But we likewise rejected the notion "that only a neurosurgeon can testify about the cause-in-fact of death from an injury to the brain, or even that a an emergency room physician could never so testify." *Broders*, 924 S.W.2d at 153. Rather, we stated the test to be whether "the offering party [has] establish[ed] that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Id.*

█ Unlike *Broders*, where the record failed to establish the emergency-room doctor's qualifications, the record here does establish Dr. McGehee's. He is a board-certified pediatrician, holds certifications in pediatric advanced life support and advanced trauma life support, and has served as the Chief of Medical Staff at Denton Regional Medical Center and the Chief of Pediatrics at Flow Medical Hospital in Denton. Additionally, Dr. McGehee

has studied the effects of pediatric neurological injuries and has extensive experience advising parents about the effects of those injuries. According to his testimony, Dr. McGehee based his opinions about the cause and extent of Courtnie's injuries on his experience, his medical training and education, a review of Courtnie's diagnostic test results from the University of Arkansas at Little Rock, and the diagnostic results from a Gregg County Early Childhood Development specialist. He also relied upon Courtnie's MRIs and CT scans, and the interpretation of these tests by Dr. Mark Laney, a pediatric neurologist whose qualifications Dr. Roberts did not challenge. Finally, Dr. McGehee consulted several peer-reviewed medical-journal articles and textbooks on pediatric neurology.

Although Dr. McGehee is not a neurologist, the record reflects that he had experience and expertise regarding the specific causes and effects of Courtnie's injuries. Therefore, we agree with the court of appeals that the trial court did not abuse its discretion in admitting his testimony on matters pertaining to Courtnie's neurological injuries.

## IV

■ Dr. Roberts next asserts that, in calculating the damages against her, the trial court failed properly to apply the $468,750 settlement credit. She maintains that the trial court should have reduced the jury's damage award[6] with this credit before multiplying that number by her proportionate responsibility as found by the jury. In other words, Dr. Roberts contends that the judgment against her should be $369,937.50 (15% × $2,466,250) rather than $440,250. This reduction, she

asserts, is required when a defendant timely elects to have a dollar-for-dollar credit. *See* TEX. CIV. PRAC. & REM.CODE § 33.012(b)(1). We disagree.

The rules of proportionate responsibility and settlement credits are found in Chapter 33 of the Civil Practices and Remedies Code. Pertinent here are sections 33.012 and 33.013, which provide in relevant part:

### § 33.012. Amount of Recovery

(a) ... the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility.

(b) If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a credit equal to one of the following

...

(1) the sum of the dollar amounts of all settlements ...

### § 33.013. Amount of Liability

(a) Except [when a defendant is jointly and severally liable], a liable defendant is liable to a claimant only for the percentage of damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death, or other harm for which the damages are allowed.

TEX. CIV. PRAC. & REM.CODE §§ 33.012(a), (b)(1), 33.013(a). Section 33.012 refers to "the amount of damages to be recovered by the claimant", while section 33.013 refers to the "damages found by the trier of

---

6. The jury awarded damages totaling $3,010,001, which included $75,001 for loss of filial consortium. In keeping with our conclusion that the common law does not recognize a claim for loss of filial consortium, we have deducted $75,001 from the jury's verdict, yielding the sum of $2,935,000.

fact." *Id.* The "amount of damages to be recovered by the claimant" under section 33.012 must be reduced by the claimant's proportionate responsibility and by settlements. No corresponding reduction is prescribed under section 33.013 because the "damages found by the trier of fact" are not affected by settlement or the claimant's shared responsibility. Thus, damages under these two sections are the same only when the claimant has not settled and shares no responsibility. And although related, the two sections pose separate inquiries. Section 33.012 controls the claimant's total recovery, while section 33.013 governs the defendant's separate liability.

Under section 33.012, the Williamsons' total recovery, including amounts received in settlement, is limited to $2,935,000, so they can receive no more than $2,466,250 ($2,935,000—$468,750) in satisfaction of this judgment. This limit, however, is independent of section 33.013's limitation on a particular defendant's percentage of responsibility. And section 33.013(a) specifically pertains to defendants who, like Dr. Roberts here, are not jointly and severally liable. That section provides that a severally-liable defendant's monetary liability is calculated by multiplying the damages found by the trier of fact by the defendant's percentage of responsibility. *See C & H Nationwide, Inc. v. Thompson,* 903 S.W.2d 315, 321 (Tex.1994) ("Section 33.013(a) sets the liability to the claimant of each [severally liable] defendant at an amount equal to that defendant's percentage of responsibility multiplied by the damages found by the trier of fact."). The trial court did this when it multiplied the jury's damage award by the 15 per cent of proportionate responsibility it assigned to

Dr. Roberts. Because Dr. Roberts' liability for $440,250, does not exceed the limit placed on the amount of damages the Williamsons may recover under section 33.012, no further credit is required.[7]

## V

Finally, Dr. Roberts challenges the court of appeals' judgment assessing all guardian ad litem costs against her. She contends that, because the Williamsons were both a successful party (against Dr. Roberts) and a losing party (against Dr. Miller), the trial court properly apportioned the ad litem costs between them.

The court approved an ad litem fee of $21,405.69 and divided it equally between Dr. Roberts and the Williamsons. At the hearing for rendition of judgment, the court stated:

> I think that an attorney ad litem is there for the benefit of all the parties that are there. I would like to, for this to be assessed as court costs, and I would like for it to be split between the Plaintiffs and between the Defendant in that particular regard. And I think, that way, it would be a little bit more fair to all parties that are concerned. And I don't think simply because there was a verdict returned against an individual, that he pays it all. We're looking at a situation where the Court feels that it would be in the best interest of the child for this individual to be appointed. And, therefore, as a result of that, it should be assessed as a court cost, and to be borne one half by [Dr. Roberts], and one half by [the Williamsons].

The court of appeals reversed the trial court's judgment, holding that, because the

---

7. Had the Williamsons negotiated a more favorable settlement, reducing section 33.012's limit on damages below Dr. Roberts proportionate share under section 33.013, a further credit would have been required. Thus, a defendant may incidentally benefit from a claimant's favorable settlement with others.

Williamsons were the successful parties, "the trial court was required by Rule 141 to state good cause on the record for assessing costs against them." 52 S.W.3d at 356. Finding no good cause, the court of appeals concluded that the trial court had abused its discretion. *Id.* We agree.

Texas Rule of Civil Procedure 131 provides that "[t]he successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided." TEX.R. CIV. P. 131. Rule 141 permits a trial court, for good cause stated on the record, to "adjudge the costs otherwise than as provided by law or [the Rules of Civil Procedure]." TEX.R. CIV. P. 141. Thus, it was the trial court's responsibility to state on the record good cause for taxing a part of the court costs against the Williamsons, the successful party. *Id.*

■ The trial court did explain its reasons for splitting costs. It observed that because an ad litem is there for the benefit of all parties, it is "fair" to split costs between the losing and prevailing parties. A guardian ad litem, however, does not serve for the benefit of all parties; the guardian is appointed to protect the child's interests. *See Am. Gen. Fire & Cas. Co. v. Vandewater*, 907 S.W.2d 491, 493 n. 2 (Tex.1995). Certainly, fairness can be good cause, but the record must substantiate the connection.

■ For example, we concluded in *Rogers v. Walmart Stores, Inc.*, 686 S.W.2d 599, 601 (Tex.1985), that the trial court had demonstrated good cause when assessing part of the ad litem costs against the prevailing party because the conduct of that party had unnecessarily prolonged and obstructed the trial. In *Furr's Supermarkets, Inc. v. Bethune*, 53 S.W.3d 375, 378 (Tex.2001), however, we reversed the lower courts' determination that the prevailing party should bear its own costs because the losing party was too emotionally

fragile to bear them. We concluded that emotional distress at paying costs was not good cause under Rule 141. *Id.* Here, the trial court's finding of good cause is premised on the perception that the prevailing party incidentally benefitted from the guardian ad litem's services. Assuming that such an incidental benefit might in a particular case provide good cause, Rule 141 still requires that the trial court state its reasons "on the record" and with more specificity than the court's general notion of fairness here. TEX.R. CIV. P. 141. Grounds of perceived fairness, without more, are insufficient to constitute good cause. *See Furr's Supermarkets, Inc.*, 53 S.W.3d at 377–78.

\* \* \* \* \* \*

We reverse that part of the court of appeals' judgment affirming the award of damages for loss of filial consortium and render judgment that the Williamsons take nothing as to this claim. The judgments of the court of appeals are otherwise affirmed.

Justice JEFFERSON, joined by Justice O'NEILL and Justice SCHNEIDER, filed a dissent to Part II of the Court's Opinion.

Justice JEFFERSON, joined by Justice O'NEILL and Justice SCHNEIDER, dissenting as to Part II only.

In *Sanchez v. Schindler*, this Court concluded that the common law is best served by permitting a parent "to recover damages for loss of companionship and society . . . for the death of his or her child." 651 S.W.2d 249, 251 (Tex.1983). In *Reagan v. Vaughn*, this Court held that the common law supports a child's recovery of damages for loss of consortium when a parent is injured but not killed by the tortious act of a third party. 804 S.W.2d 463, 466 (Tex. 1990). These cases, and others outlined

below, explain why the Court grudgingly acknowledges a "surface logic" to extending consortium rights to parents whose children are severely injured. 111 S.W.3d at 119. I am at a loss, then, to understand why the Court today concludes that the common law is best served by holding that parents have no such rights. *Id.* at 120. The Court's conclusion is contrary to our longstanding precedent, counter to the majority of jurisdictions that have considered this issue, and unduly tolerant of the anomaly it creates in the law. And the theme underlying the Court's decision—that a parent's loss of consortium claim must be rejected because adults require less protection than children—makes little sense in light of our repeated declarations that *parents* may recover consortium damages for the death of their children, and *adult children* are entitled to consortium damages for the death of, or serious injury to, their parents. Because the Court's opinion creates, but does not adequately justify, a prominent paradox in Texas law, I respectfully dissent.

## I

THE EVOLUTION OF TEXAS CONSORTIUM LAW

### A. Extending Common Law to Permit Wife's Separate Consortium Claim

Texas, like most other jurisdictions, initially limited consortium damages to a husband's claim arising out of injury to the marital relationship. *See Garrett v. Reno Oil Co.,* 271 S.W.2d 764, 768 (Tex.Civ.App.-Fort Worth 1954, writ ref'd n.r.e.) (refusing to recognize wife's reciprocal claim for consortium damages); *see also Reagan,* 804 S.W.2d at 473–75 (Hecht, J., dissenting) (chronicling history of consortium claims). Although the *Garrett* court acknowledged that recognizing a wife's reciprocal cause of action was "in accord with the broad principle of justice motivating" a

change in the common-law rule, it nevertheless declined to adopt such a change, opting instead to "follow the majority rule until such time as legislation might effect a change." *Garrett,* 271 S.W.2d at 766–67.

This Court criticized the *Garrett* court's decision for refusing to recognize a wife's claim for loss of consortium, calling it "an abdication of judicial responsibility":

> Providing either spouse with a cause of action for loss of consortium would allow us to keep pace with modern society by recognizing that the emotional interests of the marriage relationship are as worthy of protection from negligent invasion as are other legally protected interests.

*Whittlesey v. Miller,* 572 S.W.2d 665, 668 (Tex.1978). Based on this reasoning, we held that "either spouse has a cause of action for loss of consortium that might arise as a result of an injury caused to the other spouse by a third party tortfeasor's negligence." *Id.* Our decision, we noted, brought Texas in line with the majority of jurisdictions and corrected "a paradox in the law." *Id.*

### B. Extending Common Law to Permit Parent's Consortium Claim for Child's Death

Five years after *Whittlesey,* we were asked to decide whether Texas should revise its position on the traditional common-law principle limiting a surviving parent's damages for a child's death "to the pecuniary value of the child's services and financial contributions, minus the cost of his care, support and education." *Sanchez,* 651 S.W.2d at 251. Describing the pecuniary-loss rule as "antiquated and inequitable," we rejected the common-law concept which viewed the child as an economic asset. *Id.* We reasoned that

> [t]he real loss sustained by a parent is not the loss of any financial benefit to be gained from the child, but is the loss of

love, advice, comfort, companionship and society. We, therefore, reject the pecuniary loss limitation and allow a plaintiff to recover damages for loss of companionship and society and damages for mental anguish for the death of his or her child.

*Id.* Relying primarily on *Whittlesey*, we concluded that "injuries to the familial relationship are significant injuries and are worthy of compensation" and that "[such injuries] were real, direct, and personal losses ... not too intangible or conjectural to be measured in pecuniary terms." *Id.* at 252 (citing *Whittlesey*, 572 S.W.2d at 667, 668). Further, in abrogating the common-law pecuniary-loss rule, we found persuasive the argument that a parent's claim for damages for the loss of companionship of a child was closely analogous to a spouse's loss of consortium cause of action. *Id.; see also Reagan,* 804 S.W.2d at 468 (opinion on reh'g) ("The purpose of [recognizing a parental-consortium claim] is to allow children the same protection allowed spouses when a third party causes serious, permanent, and disabling injuries to their parent.").

## C. Extending Common Law to Recognize Child's Consortium Claim for Parent's Death

Two years after *Sanchez*, we again extended the common law, this time to permit children to recover damages for the mental anguish and loss of companionship resulting from their parents' death. *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 551 (Tex.1985). In *Cavnar,* we reiterated that injuries to the familial relationship are compensable. *Id.* (citing *Sanchez*, 651 S.W.2d at 252). Then, in recognizing the Cavnar children's right to recover for their mother's death, we said: "There is no logical reason to treat an injury to the familial relationship resulting from the wrongful death of *any family*

*member* enumerated [in the wrongful death statute]" differently depending on whether it is the spouse, parent or child that dies. *Id.* (emphasis added)

## D. Extending Common Law to Recognize Child's Consortium Claim for Parent's Serious, Permanent Injury

Finally, almost thirteen years ago, we decided that a child may recover damages for loss of consortium and mental anguish when a parent is severely injured by the tortious conduct of a third party. *Reagan,* 804 S.W.2d at 466. We found that consortium damages were recoverable in that context because "a serious, permanent and disabling injury to a parent" potentially visits upon the child deprivations as serious as those we recognized in *Cavnar, Sanchez,* and *Whittlesey. Id.* at 465–66 (discussing *Cavnar,* 696 S.W.2d at 551, *Sanchez,* 651 S.W.2d at 251, and *Whittlesey,* 572 S.W.2d at 667). We reaffirmed our commitment to preserving the parent-child relationship:

While all family members enjoy a mutual interest in consortium, the parent-child relationship is undeniably unique and the wellspring from which other family relationships derive. It is the parent-child relationship which most deserves protection and which, in fact, has received judicial protection in the past. The loss of a parent's love, care, companionship, and guidance can severely impact a child's development and have a major influence on a child's welfare and personality throughout life.

*Id.* at 466 (quoting *Villareal v. State,* 160 Ariz. 474, 774 P.2d 213, 217 (1989)). Finding "no principled reason to accord the parent-child relationship second class status[,]" we held that the unquestionable significance of that relationship compelled our recognition of a cause of action for a child's loss of consortium resulting from a

parent's non-fatal injury.[1] *Id.* We also declined to limit the right of recovery to minor children:

> Consistent with our prior recognition that adult children may recover for the wrongful death of a parent, [*see Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630, 635 (Tex.1986)], we decline to limit the right of recovery under this cause of action to minor children. "Although minors are the group most likely to suffer real harm due to a disruption of the parent-child relationship, we leave this to the jury to consider in fixing damages." *Ueland* [*v. Reynolds Metals Co.,*] 103 Wash.2d 131, 691 P.2d [190,] 195 [(Wash.1984)]; *see also Audubon–Exira Ready Mix, Inc. v. Illinois Cent. Gulf Co.*, 335 N.W.2d 148, 152 (Iowa 1983) ("even adult and married children have the right to expect the benefit of good parental advice and guidance") (citing *Schmitt v. Jenkins Truck Lines, Inc.*, 170 N.W.2d 632, 665 (Iowa 1969)).

*Id.* at 466.

### E. Refusing to Extend Common Law to Recognize Parent's Consortium Claim for Child's Serious, Permanent Injury

In the case now before us, the Court confronts the mirror-image of the question presented in *Reagan*—whether *parents* may recover damages for loss of consortium and mental anguish when their *child* is severely, but not fatally, injured by a third party's tortious conduct. The Court says "No," and offers as justification many of the same rationales the Court flatly rejected in *Whittlesey, Sanchez* and *Reagan:* (i) tort law cannot remedy every wrong; (ii) awarding damages in this context presents special challenges to a fact-finder; (iii) recognizing filial consortium claims would not eliminate differences in the award of intangible damages for wrongful death and personal injury cases; (iv) there are insufficient benefits to justify changing the common law in Texas; and (v) several states that have recognized the child's right to loss of consortium have denied parents any reciprocal rights.

None of these proffered explanations—when weighed against our prior decisions and the growing body of law and commentary that recognize the symbiotic nature of the parent-child relationship—provide a satisfactory justification for creating an anomaly in Texas law. Moreover, noticeably absent from the Court's analysis is any meaningful examination of Texas's consortium precedent, the importance that Texas has historically placed on the parent-child relationship, or this Court's decisions analogizing that relationship to the

---

1. When we decided *Reagan*, fewer than ten states recognized a child's claim for loss of consortium. *See Reagan v. Vaughn*, 804 S.W.2d 463, 465 n. 3 (Tex.1990). Now, twenty-one states recognize, either judicially or by statute, a child's loss of parental consortium claim. *See Hibpshman v. Prudhoe Bay Supply*, 734 P.2d 991 (Alaska 1987); *Villareal v. Dep't of Transp.*, 160 Ariz. 474, 774 P.2d 213 (1989); *Audubon–Exira Ready Mix, Inc. v. Illinois C.G.R. Co.*, 335 N.W.2d 148 (Iowa 1983); *Giuliani v. Guiler*, 951 S.W.2d 318 (Ky.1997); *Ferriter v. Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 413 N.E.2d 690 (1980); *Berger v. Weber*, 411 Mich. 1, 303 N.W.2d 424 (1981); *Pence v. Fox*, 248 Mont. 521, 813 P.2d 429 (1991); *Rolf v. Tri State Motor Transit Co.*, 91 Ohio St.3d 380, 745 N.E.2d 424 (2001); *Williams v. Hook*, 804 P.2d 1131 (Okla.1990); *Hancock v. Chattanooga Hamilton County Hosp. Auth.*, 54 S.W.3d 234 (Tenn.2001); *Hay v. Med. Ctr. Hosp.*, 145 Vt. 533, 496 A.2d 939 (1985); *Belcher v. Goins*, 184 W.Va. 395, 400 S.E.2d 830 (1990); *Theama v. Kenosha*, 117 Wis.2d 508, 344 N.W.2d 513 (1984); *Nulle v. Gillette–Campbell County Joint Powers Fire Bd.*, 797 P.2d 1171 (Wyo.1990); *see also* FLA. STAT. ANN § 768.0414; HAW.REV.STAT. ANN. § 663–3; Idaho code § 5–310; LA. CIV.CODE ANN. art. 2315; ME.REV.STAT. ANN. § 18–A, § 2–804(b); R.I. GEN. LAWS § 9–1–41; WASH. REV. CODE § 4.24.010.

reciprocal nature of the husband-wife relationship.

## II

### DECONSTRUCTING THE COURT'S OPINION

#### A. Tort Law Cannot Remedy Every Wrong

It is, of course, preferable that the law be consistent and predictable. *See, e.g., Sanchez,* 651 S.W.2d at 254 (determining that retroactive application of the Court's decision turned "primarily on the extent of public reliance on the former rule and the ability to foresee a coming change in the law"); *Whittlesey,* 572 S.W.2d at 669. Today's decision, however, will come as a great surprise to the bench and bar of Texas. As the Court points out, many of our lower courts and at least one Texas commentator have predicted that this Court, based on its precedent, would recognize a parent's claim for loss of consortium in this context. *See, e.g., Schindler Elevator Corp. v. Anderson,* 78 S.W.3d 392, 414 (Tex.App.-Houston [14th Dist.] 2001, pet. dism'd by agreement); *Parkway Hosp. v. Lee,* 946 S.W.2d 580, 590 (Tex. App.-Houston [14th Dist.] 1997, writ denied); *Enochs v. Brown,* 872 S.W.2d 312, 322 (Tex.App.-Austin 1994, no writ); *Hall v. Birchfield,* 718 S.W.2d 313, 337–38 (Tex. App.-Texarkana 1986), *rev'd on other grounds,* 747 S.W.2d 361 (Tex.1987); Benny Agosto, Jr. & Mario A. Rodriguez, *What About the Parents?* 66 TEX. B.J. 396, 396 (2003). And our decisions have, before now, justified that assumption. *See Krishnan v. Sepulveda,* 916 S.W.2d 478, 482 (Tex.1995) ("Assuming that a cause of action exists for loss of a child's consortium which is derivative of the child's claim for personal injuries ... there is no negligence cause of action arising out of the treatment or injury of a fetus."); *Reagan,* 804 S.W.2d at 489 (Doggett, J., concurring

and dissenting) ("I concur in that portion of the court's opinion expressly recognizing a cause of action for loss of parental consortium, and implicitly a consortium action by a parent upon injury of a child...."). But today, incanting that tort law cannot remedy every wrong, the Court announces that Texas does not recognize filial consortium claims for non-fatal injuries.

> This [mantra], of course, is the hue and cry in many tort cases and in essence is no more than the fear that some cases will be decided badly. Undoubtedly, the system will not decide each case correctly in this field, just as it does not in any field, but here, as in other areas of tort law, [ ] it [is] better to adopt a rule which will enable courts to strive for justice in all cases rather than to rely upon one which will ensure injustice to many.

*Reben v. Ely,* 146 Ariz. 309, 705 P.2d 1360, 1364 (App.1985) (recognizing filial consortium claim) (quoting *Univ. of Ariz. Health Sciences Ctr. v. Superior Court,* 136 Ariz. 579, 667 P.2d 1294, 1298 (1983)). The rule the Court adopts, rather than providing parents of seriously injured children the same protections the Court has given to spouses and children, ensures that Texas parents will be denied recovery for a loss the Court has already concluded is real, significant, and worthy of compensation. *See Reagan,* 804 S.W.2d at 466 (recognizing parental consortium claim for non-fatal injuries). The error of this rule is compounded by the detour the Court must take from our precedent to arrive at its conclusion.

The Court asserts that tort law generally denies recourse to those who are harmed only indirectly by another's negligence. 111 S.W.3d at 118. Acknowledging that the consortium claims this Court has recognized are an exception to this rule, the Court then attempts to dis-

tinguish the filial consortium claim at issue here. To do this, the Court asserts that claims for filial consortium are more akin to consortium claims by siblings and step-parents than spouses and children. *See id.* at 118 ("[W]hile we have recognized that spouses and children can recover loss of consortium, we have concluded that siblings and step-parents cannot.") (citations omitted). By determining that filial consortium claims are analogous to sibling and step-parent consortium claims, the Court concludes that such claims are not actionable in Texas. *See id.* at 118; *see also Ford Motor Co. v. Miles,* 967 S.W.2d 377, 383 (Tex.1998) (denying siblings and step-parents consortium damages by adhering to the boundaries for loss of consortium established in *Reagan* ). But we are not dealing with a sibling or step-parent here; Courtnie Williamson is the six-year-old daughter of Lainie and Casey Williamson. We have accorded special treatment to the "obvious and unquestionable" parent-child relationship for years, and for years have consistently rejected arguments that friends, step-parents, and siblings must, in principle, receive equivalent recognition. The Court's regurgitation of that old issue only diverts attention from its assault on the principles underlying *Reagan,* 804 S.W.2d 463, *Cavnar,* 696 S.W.2d 549, *Yowell,* 703 S.W.2d 630, *Sanchez,* 651 S.W.2d 249, and *Whittlesey,* 572 S.W.2d 665.

In defiance of our clear holdings in this area, the Court adopts the position that "the parent-child relationship is not reciprocal" and that "the child's interest deserves greater protection because of the child's singular emotional dependency on the parents." 111 S.W.3d at 117. Not only does this constrained view of reciprocity contradict our previous writings, it is unpersuasive in light of the fact that mutual dependency has never been a basis for rejecting consortium claims in any of our prior cases brought by a member of the husband-wife or parent-child relationship.

In the past, we have explained that no logical reason exists for treating injuries to family members identified by the wrongful death statute differently depending on whether the injured party is the spouse, parent or child. This is true regardless of whether the resulting harm is serious, permanent bodily injury or death.[2] *Cf. Cavnar,* 696 S.W.2d at 551. Applying this principle in *Reagan,* we remarked that even adult children should be entitled to recover consortium damages when their parents suffer non-fatal injuries. 804 S.W.2d at 466. Because we expressly rejected the notion that consortium damages are available only if the plaintiff is dependent on the injured party, I am unpersuaded that the real reason for rejecting filial consortium claims is the lack of reciprocity in the parent-child relationship.

The Court's conclusion pertaining to reciprocity is all the more surprising considering that our jurisprudence has settled on

---

**2.** As the Arizona Supreme Court has recognized, death is often "separated from severe injury by mere fortuity; and it would be anomalous to distinguish between the two when the quality of consortium is negatively affected by both." *Frank v. Superior Court of Ariz.,* 150 Ariz. 228, 722 P.2d 955, 957 (1986). The court further explained:

Perhaps the loss of companionship and society experienced by the parents of a child permanently and severely injured ... is in some ways even greater than that suffered by parents of a deceased child. Not only has the normal family relationship been destroyed, as when a child dies, but the parent also is confronted with his loss each time he is with his child and experiences again the child's diminished capacity to give comfort, society, and companionship. *Id.* at 958 (quoting Simpson, *The Parental Claim for Loss of Society and Companionship Resulting From the Negligent Injury of a Child: A Proposal for Arizona,* 1980 Ariz. St. L.J. 909, 923 (1980)).

the proposition that "[t]he real loss sustained by a parent is not the loss of any financial benefit to be gained from the child, but is the loss of love, advice, comfort, companionship and society." *Sanchez*, 651 S.W.2d at 251. We have unequivocally held that these losses are "real, direct, and personal losses" and "worthy of compensation." *Id.* at 252. We have never conditioned recovery on dependency.

Even assuming for purposes of argument that this Court has now adopted the view that a parent can "fill in the void of his or her loss" by "seeking out new relationships," consideration of this factor, as in *Reagan*, is but one of many facets of the relationship that juries weigh when making damage assessments. 111 S.W.3d at 118 (quoting *Hay v. Med. Ctr. Hosp. of Vt.*, 145 Vt. 533, 496 A.2d 939, 942 (1985)); *see also Reagan*, 804 S.W.2d at 466. In light of our prior holdings pertaining to the parent-child relationship, more persuasive authority is required to deny parents the right to recover filial consortium damages but continue to allow children, including adult children, to recover for the same injuries.

## B. Damages Present Special Challenges to Factfinder

Similarly unpersuasive is the Court's contention that we must reject filial consortium claims because the damage assessment is difficult. Loss of consortium is a common-law doctrine that we have consistently modified to adapt to changes in societal norms and values. Unlike other intangible values compensated by tort, consortium does not focus directly on a plaintiff's internal feelings. *See, e.g., Reagan*, 804 S.W.2d at 467. Instead, recovery for consortium attaches value to a plaintiff's lost opportunity to derive benefit from another person. *Id.* Stated another way, consortium damages reflect the intan-

gible, non-economic benefits inherent in the interaction associated with certain relationship, *i.e.*, spouses and parents and children. *See Whittlesey*, 572 S.W.2d at 666.

This Court, and almost every court in the nation, recognizes that consortium damages are neither "too intangible [n]or conjectural to be measured in pecuniary terms by a jury." *Whittlesey*, 572 S.W.2d at 667; *Sanchez*, 651 S.W.2d at 253 (dismissing argument that consortium damages are "too speculative to be given a monetary value"); *see also* cases cited *supra* note 1 and *infra* note 4. The Court speculates that "[t]he jury apparently concluded that while the child's intangible losses would grow with time, her continuing impairment would have no substantial effect on the parent-child relationship in the future." 111 S.W.3d at 119. The Court also notes that "[a]nother jury after hearing the same evidence might well have reached a very different conclusion." *Id.* But is that not true in every jury case? And is that not an issue of factual or legal sufficiency—an inquiry wholly distinct from whether we should recognize the cause of action in the first instance?

It is true that consortium damages are difficult to assess. *See, e.g., Sanchez*, 651 S.W.2d at 253; *Whittlesey*, 572 S.W.2d at 667. They are intangible and therefore resist mathematical computation. Because the damages are ethereal, different juries may well award different (and sometimes excessive) amounts based on similar facts. But we have not, until today, let those difficulties overcome our larger interest in the fair adjudication of a valid claim, nor our confidence in our judiciary to fulfill their duty to review awards:

The fear of excessive verdicts is not a sufficient justification for denying recovery for loss of companionship. The judicial system has adequate safeguards to

prevent recovery of damages based on sympathy or prejudice rather than fair and just compensation for the plaintiff's injuries.

*Sanchez*, 651 S.W.2d at 253; *see also Whittlesey*, 572 S.W.2d at 667. Thus, I do not understand how the Court can now, in good faith, contend that the difficulties of calculating damages in filial consortium cases warrant denying such claims altogether.

**C. Filial Consortium Claims and Wrongful Death**

As another justification for denying filial consortium claims, the Court maintains that when the child survives, there is no need to recognize a parent's action to prevent the tortfeasor from escaping liability. 111 S.W.3d at 120. Thus, concludes the Court, it is not anomalous to recognize a parent's intangible damages in death but not personal injury actions. *Id.* *But see Miles*, 967 S.W.2d at 383 ("it would be anomalous to recognize a cause of action for loss of consortium for a severe injury to a loved one when there is no recovery for the death of that same family member"). Applying this rationale consistent-ly, however, would preclude consortium damages in all personal injury cases. But, as previously discussed, this Court has already recognized that both spouses and children may recover consortium damages in personal injury actions. Thus, I do not understand how denying the parents' filial consortium claims here, while permitting recovery in other personal injury cases, does not create an aberration in Texas law.[3]

By focusing on the differences between wrongful death and personal injury cases, the Court attempts to make more palatable the fact that some plaintiffs may recover consortium damages while others in a similar position may not. While this conclusion itself is problematic, the Court misapprehends the true nature of the inconsistency created by its opinion: two of the three plaintiff groups identified in the wrongful death statute can recover consortium damages in personal injury actions but the third is walled off. *See* Tex. Civ. Prac. & Rem.Code § 71.004(b) (identifying persons who may recover under wrongful death statutes). The Court's decision today also relegates parents to second-class status and reneges on the Court's earlier

3. To the extent that the Court is persuaded by reasoning from other courts, there is ample precedent to demonstrate that today's opinion, in fact, bucks the national trend. *See, e.g., Reben v. Ely*, 146 Ariz. 309, 705 P.2d 1360, 1364–65 (App.1985) ("The public policy governing a parent's claim for a child's death is analogous to the policy controlling the parent's derivative claim for a child's injury.") (quoting *Norvell v. Cuyahoga County Hosp.*, 11 Ohio App.3d 70, 463 N.E.2d 111, 115 (1983)); *Giuliani*, 951 S.W.2d at 321 ("there is no legal distinction between the claim of a parent for loss of a child's consortium from the claim of a child for the loss of a parent's consortium"); *Berger*, 303 N.W.2d at 426 ("the real anomaly is to allow a child's recovery for the loss of a parent's society and companionship when the loss attends to the parent's death but to deny such recovery when the loss attends the parent's injury");

*Pence*, 813 P.2d at 433 ("The claim for loss of parental consortium ... is not sufficiently distinguishable from either spousal consortium claims in injury cases or children's consortium claims in death cases to warrant non-recognition.") (quoting *Hibpshman*, 734 P.2d at 994); *Gallimore v. Children's Hosp. Med. Ctr.*, 67 Ohio St.3d 244, 617 N.E.2d 1052, 1057 (1993) ("[I]n the present day, it would be incongruous to deny parents recovery for loss of the society and companionship of a seriously injured child while recognizing that such losses are compensable in cases involving death."); *Hook*, 804 P.2d at 1137 ("When a parent dies in Oklahoma, it would be an anomaly indeed if a child were allowed recovery for the loss of a parent's society and companionship when the loss attends the parent's death, but denied recovery when the equivalent loss attends the parent's permanent injury.").

promise to protect the familial relationship as a whole. *See, e.g., Reagan,* 804 S.W.2d at 466; *Sanchez,* 651 S.W.2d at 252.

### D. Cost–Benefit Analysis

The Court correctly notes that, "[w]hen recognizing a new cause of action and the accompanying expansion of duty, we must perform something akin to a cost-benefit analysis to assure that this expansion of liability is justified." 111 S.W.3d at 118. In performing its analysis, however, the Court proceeds as if we have never before considered the relative advantages and disadvantages of permitting consortium claims for injuries to the parent-child relationship. Ultimately, the Court concludes that we should reject filial consortium claims associated with a child's injury because permitting parents a separate cause of action will further uncertainty in the law and widen the divergence in recoveries among similarly situated victims. *Id.* And, asserts the Court, "it is not at all clear that this additional layer of liability will produce corresponding benefits of deterrence or fair compensation." *Id.* But we have already given due consideration to these principles and concluded that consortium damages should be available for injuries to the parent-child relationship. *See Reagan,* 804 S.W.2d at 464–66; *Cavnar,* 696 S.W.2d at 551; *Sanchez,* 651 S.W.2d at 253–54.

In balancing parents' interests in compensation for the lost society and companionship of their injured children against tortfeasors' interests in freedom from additional liability—giving appropriate consideration to the social consequences of each alternative—there are, of course, numerous influencing factors, included but not limited to: (i) whether recognizing filial consortium claims will yield a significant social benefit; (ii) the relative costs born by parents versus those born by the general public; (iii) the nature of the asserted loss; (iv) the connection between the plaintiff and defendant; and (v) the ability to fairly assess damages. In *Reagan, Cavnar,* and *Sanchez,* we considered similar factors and concluded that, on balance, they weigh in favor of permitting parents to recover consortium damages related to their children's injuries, there is no need to analyze them again here. It should suffice to say that, as a matter of *stare decisis,* our conclusions in those cases govern today.

### E. States Recognizing Child's Rights Have Rejected Parent's

Finally, the Court suggests that, because some courts that have recognized parental consortium claims have rejected filial consortium claims, so too should Texas. 111 S.W.3d at 120. But most courts recognize the inconsistency in permitting parental consortium claims but denying those for filial consortium. *See, e.g., Gillispie v. Beta Constr. Co.,* 842 P.2d 1272, 1274 (Alaska 1992) ("We have already held that a wife has the right to sue for loss of 'care, comfort, companionship and solace' resulting from an injury to her husband, and that a child is entitled to loss of consortium damages when his parent is tortiously injured. To now hold that a parent is not entitled to recover loss of society for the death of his or her child would run counter to this line of precedent."); *Giuliani v. Guiler,* 951 S.W.2d 318, 321 (Ky. 1997); *Berger v. Weber,* 411 Mich. 1, 303 N.W.2d 424, 434 (1981) (Levin, J., dissenting); *Pence v. Fox,* 248 Mont. 521, 813 P.2d 429, 433 (1991); *Gallimore v. Children's Hosp. Med. Ctr.,* 67 Ohio St.3d 244, 617 N.E.2d 1052, 1057 (1993). More specifically, courts across the country widely acknowledge that, within each category of parental or filial consortium, permitting recovery for death but not serious injury creates a legal anomaly. *See, e.g., Audubon–Exira Ready Mix, Inc.,* 335 N.W.2d

at 149; *Giuliani*, 951 S.W.2d at 321; *Berger*, 303 N.W.2d at 426; *Gallimore*, 617 N.E.2d at 1057; *Williams v. Hook*, 804 P.2d 1131, 1136 (Okla.1990). Unsurprisingly, then, most of the states that recognize the child's consortium claim also recognize parents' reciprocal right to recover consortium damages.[4] Underlying each of these decisions is the notion that the parent-child relationship is reciprocal, despite the fact that each party to the relationship receives different benefits from the other.

## III

### CONCLUSION

In the past, this Court has recognized consortium claims for the injury or death of a spouse, the injury or death of a parent, and the death of a child. We have consistently limited consortium claims—as has the Wrongful Death Act—to the husband-wife and parent-child relationships. Today, however, the Court concludes that "no compelling social policy impels us to recognize a parent's right to damages for the loss of filial consortium" associated with a child's injury. 111 S.W.3d at 120. By failing to recognize parents' right to recover damages for injuries tortiously inflicted upon their children, the Court creates an incongruence between its stated policy of protecting the parent-child relationship and the law.

When we decided *Reagan v. Vaughn* in 1990, we crossed a Rubicon. We committed ourselves to the proposition that the parent-child relationship—not just the child-parent relationship—is one deserving of "special protection." Because the Court cannot show that *Reagan* has become unworkable or that the law has changed so significantly that the consortium doctrine has somehow become antiquated or obsolete, it should be constrained by principles of *stare decisis* from reversing course and disturbing the settled expectations it has promoted. The Court evades *Reagan* only by resort to immaterial distinctions between a parent's loss of companionship resulting from death and a similar loss of companionship resulting from a severe, permanent, and disabling injury.

The Court's decision marks a significant departure from our consortium precedent, for which the Court provides no adequate justification. I would affirm the court of appeals' judgment in all respects. Because the Court does otherwise, I respectfully dissent from Part II of the Court's opinion.

---

4. Currently, nineteen states recognize a parent's right to recover, either judicially or by statute, for loss of a child's consortium. *See Gillispie v. Beta Constr. Co.*, 842 P.2d 1272 (Alaska 1992); *Howard Frank, M.D., P.C. v. Superior Court*, 150 Ariz. 228, 722 P.2d 955 (1986); *United States v. Dempsey*, 635 So.2d 961 (Fla.1994); *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 780 P.2d 566 (1989); *Dep't of Educ. v. Blevins*, 707 S.W.2d 782 (Ky.1986); *Vincent v. Morgan's L. & T.R. & S.S. Co.*, 140 La. 1027, 74 So. 541 (1917); *Larson v. Dunn*, 460 N.W.2d 39 (Minn.1990); *Pence*, 248 Mont. 521, 813 P.2d 429; *First Trust Co. v. Scheels Hardware & Sports Shop*, 429 N.W.2d 5 (N.D.1988); *Gallimore*, 67 Ohio St.3d 244,

617 N.E.2d 1052; *Gaither v. City of Tulsa*, 664 P.2d 1026 (Okla.1983); *Hancock*, 54 S.W.3d 234; *Belcher*, 184 W.Va. 395, 400 S.E.2d 830; *Shockley v. Prier*, 66 Wis.2d 394, 225 N.W.2d 495 (1975); *see also* HAW.REV. STAT. ANN. § 663–3; IDAHO CODE § 5–310; IOWA R. CIV. P. 1.206; LA. CIV.CODE ANN. art. 2315; MASS. GEN. LAWS, ch. 231, § 85X; R.I. GEN. LAWS § 9–1–41; WASH. REV.CODE § 4.24.010. Illinois, Minnesota, and North Dakota recognize the parent's claim but not the child's. *See supra*, note 4. Conversely, Michigan, Vermont, West Virginia, and Wyoming recognize the child's claim but not the parent's. *See supra*, note 1.