# NO. 12-19-00149-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *EDUARDO TANHUI, M.D. AND EAST TEXAS MEDICAL SPECIALTIES, P.A., APPELLANTS* | § | *APPEAL FROM THE 145TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *MINNIE RHODES-MADISON, APPELLEE* | § | *NACOGDOCHES COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

In this healthcare liability suit brought by Minnie Rhodes-Madison against Eduardo Tanhui, M.D. and East Texas Medical Specialties, P.A., Appellants challenge the trial court's denial of their motion to dismiss pursuant to Section 74.351 of the Texas Medical Liability Act.[1] In two issues, Appellants contend that Rhodes-Madison's expert is not qualified, and his report does not comply with the statutory requirements. We affirm.

## BACKGROUND

Rhodes-Madison, who had a history of lower back pain and leg pain, was a patient of Dr. Tanhui from 2012 through early 2016. He diagnosed her with lumbar spinal stenosis and radiculopathy and treated her with injections of the lumbar spine. On February 2, 2016, Dr. Tanhui attempted, unsuccessfully, to implant a spinal cord stimulator. After the attempted procedure, Rhodes-Madison experienced severe left leg pain and weakness, causing difficulty walking. In contrast to her condition before the attempted procedure, after the attempt she can no longer independently perform the activities of daily living. She underwent spinal surgery, performed by a different doctor, on April 25, 2016.

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (West 2017).

Rhodes-Madison sued Dr. Tanhui and East Texas Medical Specialties, P.A. for negligence, seeking damages and exemplary damages caused by the February 2, 2016 attempted procedure. She alleged that Dr. Tanhui failed to order appropriate preoperative imaging, failed to immediately terminate the procedure upon encountering the very tight epidural space, repeatedly attempted to implant the spinal cord stimulator although her anatomy rendered her unsuitable for the device, attempted to perform a procedure for which he lacked the requisite skill, and caused injury and permanent disability. She alleged that East Texas Medical Specialties, P.A. is vicariously liable for Dr. Tanhui's breach of the duty of care.

As required by Section 74.351(a), Rhodes-Madison furnished the expert report and curriculum vitae of her expert, Dr. Miguel de la Garza. Appellants objected to the report and requested dismissal of the case. The trial court sustained the objections, but declined to dismiss, instead allowing Rhodes-Madison thirty days to amend her report. Rhodes-Madison filed a supplemental expert report, and Appellants filed renewed objections to the expert report, again seeking dismissal of the case. The trial court denied the renewed objections. Appellants appealed the ruling.[2]

## EXPERT REPORT

In their first issue, Appellants contend that Dr. de la Garza's report is deficient because it does not meet the statute's causation requirement. They argue that the report contains no factual explanation of how and why it can be said that Dr. Tanhui's negligence caused the surgery to fail. In their second issue, Appellants assert that Dr. de la Garza is not qualified to submit an expert report in this case because he has never performed back surgery.

**Standard of Review**

We review a trial court's decision to grant or deny a motion to dismiss based on the adequacy of a Section 74.351 expert report for an abuse of discretion. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam). In analyzing a report's sufficiency under this standard, we consider only the information contained within the four corners of the report. *Id*. A trial court abuses its discretion if it acts without reference to guiding rules or principles. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015).

---

[2] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (West Supp. 2018); *Lewis v. Funderburk*, 253 S.W.3d 204, 207-08 (Tex. 2008).

**Applicable Law**

The Texas Medical Liability Act requires a health care claimant to furnish a written expert report early in the proceedings summarizing the applicable standards of care and explaining how the provider's alleged negligence caused the claimant's injury. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (r)(6). The purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation. *Abshire*, 563 S.W.3d at 223. The Act provides a mechanism for dismissal of the claimant's suit in the event of an untimely or deficient report. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b), (l).

The proponent of an expert report has the burden to show that the expert is qualified. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996). A person may qualify as an expert witness on the issue of whether a physician departed from accepted standards of care if the witness is a physician who (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose; (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care. TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a). To determine whether a witness is qualified on the basis of training or experience, we consider whether the witness is (1) board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and (2) actively practicing medicine in rendering medical care services relevant to the claim. *Id*. § 74.401(c). A person may qualify as an expert witness on the issue of the causal relationship between the alleged departure from accepted standards of care and the injury claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence. *Id*. § 74.403(a). The offered report must demonstrate that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject. *Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003).

An expert report is sufficient under the Act if it provides a fair summary of the expert's opinions regarding applicable standards of care, the manner in which the care rendered failed to meet the standards, and the causal relationship between the failure and the injury. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). The trial court need only find that the report constitutes a good faith effort to comply with the statutory requirements. *Id*. § 74.351(l). An expert report

demonstrates a good faith effort to establish the causal relationship element when it (1) informs the defendant of the specific conduct called into question and (2) provides a basis for the trial court to conclude the claims have merit. *Abshire*, 563 S.W.3d at 223. A report need not marshal all the claimant's proof, but a report that merely states the expert's conclusions about the standard of care, breach, and causation is insufficient. *Id*. The expert must explain the basis of his statements to link his conclusions to the facts. *Id*. at 224.

In medical malpractice cases, plaintiffs are required to adduce evidence of a reasonable medical probability or reasonable probability that their injuries were caused by the negligence of one or more defendants, meaning that it is more likely than not that the ultimate harm or condition resulted from such negligence. *Jelinek v. Casas*, 328 S.W.3d 526, 532-33 (Tex. 2010). The expert must explain, based on facts set out in the report, how and why the breach of the standard of care caused the injury. *Id.* at 539-40. In doing so, the expert report must make a good-faith effort to explain, factually, how proximate cause is going to be proven. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. *Id*. For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—i.e. but for the act or omission—the harm would not have occurred. *Id*. The expert report must explain this causal relationship between the breach and injury to satisfy the Act. *Id*. When a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient. *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671-72 (Tex. 2008) (per curiam).

**Analysis**

Appellants contend that the injury complained of in this suit is Rhodes-Madison's condition following the April surgery, claiming that "[u]ltimately, Dr. de la Garza opines that Dr. Tanhui caused the bad outcome of the April 2016 spine surgery." They assert that the direct cause of the injuries complained of was the April 25, 2016 surgery.

Appellants further argue that the expert "reports are missing a factual explanation of how and why it can be said that Dr. Tanhui's negligence caused the April 25, 2016 surgery to fail." They assert that Dr. Tanhui speculates where and how an injury might have occurred without definitively committing to a specific injury at a specific location, and without providing a discussion of the specific facts as seen in the patient's body. Asserting that his "causation opinion

4

merges together at the April 25, 2016 surgery," they argue that Dr. de la Garza provides no factual discussion "to draw a line from the alleged breaches of the standard of care to what was seen in the patient's body in the April 25, 2016 surgery."

We disagree with Appellants' characterization of the claims in the case. Dr. Tanhui attempted to perform a procedure on Rhodes-Madison on February 2, 2016. In her petition, Rhodes-Madison asserts that Dr. Tanhui's negligence injured her on February 2, 2016. She did not assert in her petition that Dr. Tanhui committed negligence on April 25, 2016. As we explain below, Dr. de la Garza's expert report supports the claims asserted in the petition. For purposes of our review, Appellants' focus on Rhodes-Madison's post-surgery condition is misplaced. Any discussion of potential damages caused by the surgery is irrelevant to the question before us.

### *Qualifications*

Appellants are not disputing that Dr. de la Garza is a "well-qualified-and-credentialed pain management physician." They argue that the spine surgery aspect of this case is dominant and controls the qualifications needed by Dr. de la Garza. They assert that he is not a surgeon, not qualified to speak to what would have happened in the spine surgery, and therefore, not qualified to speak to causation in this case. However, because Rhodes-Madison is complaining about Dr. Tanhui's actions on February 2, 2016, during which he attempted a procedure to help manage Rhodes-Madison's back pain, we focus on whether Dr. de la Garza is qualified to provide expert testimony on that subject.

Dr. de la Garza completed his anesthesia residency in 2005 and an interventional pain medicine fellowship in 2006. He is board certified in anesthesiology and pain medicine. He is a member of and active in numerous organizations in his professional field. He has authored numerous publications and lectured on the topics of anesthesia, interventional pain medicine, and addiction. In his practice, he performs interventional pain procedures, specializing in minimally invasive surgical decompression and/or fusion of herniated discs and spinal stenosis, implantable intrathecal pumps, spinal cord stimulation, and peripheral nerve stimulation. He has experience in and knowledge of pain management, anesthesia medicine, and care of patients suffering from the exact medical conditions as Rhodes-Madison. He routinely treats such patients and knows the applicable standard of care.

Dr. de la Garza's curriculum vitae and reports show that he is board certified in pain management, a medical practice area relevant to this case. *See* TEX. CIV. PRAC. & REM. CODE

5

ANN. § 74.401(c). He actively practices medicine involving rendering medical care services of the same type involved in the claim and has knowledge of the accepted standards of care applicable to pain management of patients experiencing spinal pain. *See id*. § 74.401(a). Dr. de la Garza has education, training, knowledge, skill, and experience in treating patients with the same conditions as Rhodes-Madison, including experience performing spinal cord stimulation implantation, qualifying him to give an expert opinion on the subject of spine-related pain management. *See Roberts*, 111 S.W.3d at 121. We overrule Appellants' second issue.

### *Causation*

Dr. de la Garza reviewed Rhodes-Madison's medical records. In January 2014, she was diagnosed by MRI with mild to moderate spinal stenosis at specified vertebrae in the thoracic and lumbar regions, and severe lumbar spinal canal stenosis at specified vertebrae. Dr. de la Garza stated that the spinal cord stenosis present at all vertebral levels where Dr. Tanhui was to place the spinal cord stimulator leads was likely to prevent satisfactory placement. Therefore, Rhodes-Madison was not a suitable candidate for percutaneous spinal cord stimulator placement, and Dr. Tanhui's attempt to perform the procedure was a breach of the standard of care.

In his supplemental report, Dr. de la Garza clarified how Dr. Tanhui caused the injury during the attempt to place the spinal cord stimulator. He stated:

> Dr. Tanhui physically injured Ms. Rhodes-Madison's thoracic and lumbar spinal nerves, including her cauda equina nerves that innervate the lumbar and sacral myotomes and dermatomes of the low back and legs, while attempting to insert a Tuohy needle and/or the spinal cord stimulator leads into the lumbar and/or thoracic epidural space during the spinal cord stimulator trial. . . . Regarding the mechanism of the actual injury to the nerves, more likely than not, Dr. Tanhui's repeated attempts to insert the needle into Ms. Rhodes-Madison's extremely tight lumbar and thoracic epidural space either compressed or physically traumatized the nerve fibers of the dorsal columns of the spinal cord or the nerve roots in the cauda equina causing immediate increased pain and loss of function. In effect, the needle and/or the spinal cord stimulator lead compressed the nerves within the very tight bony spinal canal where there was already little room for anything else. Thus, forcing the needle and/or spinal cord stimulator lead displaced the nerve fibers, crushing such fibers or shearing them during placement of the needle and/or spinal cord stimulator lead in the spinal canal where there was no excess room. Essentially, Dr. Tanhui created a 'space occupying lesion' that caused permanent nerve damage to Ms. Rhodes-Madison.
>
> . . .
>
> It is noted that prior to the attempted SCS placement by Dr. Tanhui, Ms. Rhodes-Madison was independent for all activities of daily living ("ADLs"). However, following the attempted SCS placement, she consistently exhibited pain and

weakness that impaired her to the point that she required assistance with ADLs, either by using a walker or wheel chair. Thus, as she has not substantially improved from her condition following Dr. Tanhui's attempted placement of the SCS, it is apparent that the injury suffered at his hands was a cause of Ms. Rhodes-Madison['s] permanent disability.

Dr. de la Garza stated that Dr. Tanhui's attempt to place the spinal cord stimulator caused Rhodes-Madison to suffer permanent neurologic injury, including severe lower extremity weakness and loss of function.

Dr. de la Garza opined that Dr. Tanhui also breached the standard of care by not sending Rhodes-Madison to a spine surgeon for evaluation and treatment either when he first received the results of her January 6, 2014 MRI or promptly after the February 2016 attempted spinal cord stimulator placement. He noted that Rhodes-Madison had longstanding, persistent, symptomatic critical lumbar central canal stenosis, and her condition was resistant to Dr. Tanhui's treatments over several years. Dr. de la Garza explained that when Dr. Tanhui's prior lumbar epidural steroid injections and other interventional treatments failed to provide substantial sustained relief, in light of the January 2014 MRI findings, and since Rhodes-Madison's back and leg pain continued to worsen, Dr. Tanhui should have referred her to a spine surgeon for evaluation and treatment instead of attempting to place spinal cord stimulator leads.

In his supplemental report Dr. de la Garza elaborated as follows:

Had Dr. Tanhui complied with the standard of care required of a physician treating a patient such as Ms. Rhodes-Madison and referred her to a spine surgeon for evaluation and treatment rather than trying to force the placement of the SCS leads, these physical neurologic injuries would not have occurred. It is important to note that this was an elective procedure. If the evaluation by the surgeon lead (sic) to a lumbar decompression of the spinal stenosis, a spinal cord stimulator trial could have been placed if her pain persisted, but with the added safety of a decompression that would have allowed a safer SCS placement attempt.

Dr. de la Garza opined that, had Dr. Tanhui met the standard of care and referred Rhodes-Madison to a spine surgeon instead of attempting placement of the spinal cord stimulator, she likely would not have suffered the permanent injury and permanent disability as a result of loss of function.

7

Further, after the attempted procedure, Rhodes-Madison suffered an exacerbation of lumbar spinal stenosis, coupled with a progression and/or new neurologic injury characterized by lower extremity weakness, worsened pain, and loss of ambulatory function. Dr. de la Garza explained that these signs and symptoms are indications of nerve injury and need to be promptly evaluated by a spine surgeon. Once Dr. Tanhui became aware that the attempt had injured Rhodes-Madison he should have promptly referred her to a spine surgeon. Dr. de la Garza opined that urgent decompression of the lumbar and/or thoracic canal stenosis would "in all likelihood" have improved her long-term function with ADLs and may have improved her leg and/or back pain. Therefore, according to Dr. de la Garza, Dr. Tanhui's failure to provide adequate and appropriate follow-up care following the attempt to place the spinal cord stimulator leads, that is, his failure to recognize the need, and to immediately arrange for Rhodes-Madison to be seen by a spine surgeon, breached the standard of care.

Dr. de la Garza identified the standard of care—placing spinal cord stimulator leads in patients who are suitable candidates and doing so without physically traumatizing the nerve fibers or roots. The standard of care also requires a referral to a spine surgeon when a patient who has severe stenosis has not responded to prior treatments and when the doctor becomes aware that his attempt to place spinal cord stimulator leads caused damage to the patient. Dr. de la Garza made a good faith effort to establish the causal relationship element by explaining how Dr. Tanhui's act of repeatedly inserting the needle in the small space compressed, physically traumatized, and displaced the nerve fibers, crushing or shearing them. Dr. de la Garza linked the worsened condition that Rhodes-Madison experienced after the attempted procedure to Dr. Tanhui's breach of the standard of care to show that his actions caused her injuries. Further, had Dr. Tanhui sent Rhodes-Madison to a surgeon instead of attempting to place the spinal cord stimulator, he would not have caused nerve damage. And referring her to a surgeon immediately after his attempt, "in all likelihood," would have led to improvement in her condition. His failure to do so caused her to miss that opportunity for improvement.

We conclude that Dr. de la Garza's reports constitute a good faith effort to comply with the statutory requirements and provide a basis for the trial court to conclude Rhodes-Madison's claims have merit. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l); *Abshire*, 563 S.W.3d at 223; *Gardner*, 274 S.W.3d at 671-72. Therefore, the trial court did not abuse its discretion in

8

overruling Appellants' objections to the expert reports and denying their motion to dismiss. We overrule Appellants' first issue.

## DISPOSITION

Because Appellants have shown no abuse of discretion, we *affirm* the trial court's order denying Appellants' motion to dismiss.

**GREG NEELEY**
Justice

Opinion delivered September 18, 2019.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

9



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

### SEPTEMBER 18, 2019

### NO. 12-19-00149-CV

**EDUARDO TANHUI, M.D. AND
EAST TEXAS MEDICAL SPECIALTIES, P.A.,**
Appellants
V.
**MINNIE RHODES-MADISON,**
Appellee

Appeal from the 145th District Court

of Nacogdoches County, Texas (Tr.Ct.No. C1833683)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the trial court's order.

It is therefore ORDERED, ADJUDGED and DECREED that the order of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against Appellants, **EDUARDO TANHUI, M.D. and EAST TEXAS MEDICAL SPECIALITES, P.A.**, for which execution may issue, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*